Jeffrey Scott WEIMAR, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–388.

Court of Criminal Appeals of Oklahoma.

Nov. 19, 1976.

1. See *Lawson v. State,* Okl.Cr., 476 P.2d 89 and *Jones v. State,* Okl.Cr., 488 P.2d 372

Bill A. Pipkin, Moore, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Michael L. Darrah, Legal Intern, for appellee.

## OPINION

BLISS, Judge:

Appellant, Jeffrey Scott Weimar, hereinafter referred to as defendant, was charged in the District Court, Cleveland County, Case No. CRF–75–25, for the offense of Attempted Manufacture of a Controlled Dangerous Substance, to wit, an Isomer of 3, 4, 5-trimethoxy-amphetamine, in violation of 63 O.S.1971, §§ 2–402 and 2–408. The case was tried before a jury, and a guilty verdict was returned. Punishment was set at two (2) years' imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Dr. Eddie Smith, who stated that he was a research chemist at the University of Oklahoma in Norman, Oklahoma. He also stated that he was vice chairman of the Chemistry Department, and that the duties attendant upon that position included supervision of both students and the non-professorial staff. He stated that in this capacity he was very familiar with the students in the Chemistry Department and the facilities as well. Dr. Smith stated that the defendant was not a student nor on the staff of the Chemistry Department, nor to his knowledge had the defendant been given permission to use any Chemistry Department facilities. It was further elicited from this witness that Room 407 in DeBarr Hall had not been used as a laboratory for some time, and that its present use was merely for storage. He further testified that Dr. Leon Ciereszko had primary use of Room 407, and that the door to it was normally locked. Lastly, Dr. Smith stated that to his knowledge no member of the University of Oklahoma Chemistry Department had a certificate to do research with com-

pounds contained in the Uniform Controlled Dangerous Substances Act.

The State's second witness was Dr. Leon Ciereszko, also with the Chemistry Department at the University of Oklahoma. He too stated that Room 407, DeBarr Hall, was not currently used as a laboratory, but was used solely by him for the purposes of storage. Further, he stated that to his knowledge the defendant was not connected with the Chemistry Department. Dr. Ciereszko further testified that he knew that a Dr. Schmitz, professor on the chemistry staff at O.U., was doing research involving marine organisms, but that to his knowledge this work did not involve substances listed on the Uniform Controlled Dangerous Substances Act.

Mike Feuerborn was the State's third witness. He stated that he was an investigator with the University of Oklahoma Police Department. On January 15, 1975, at about noon, the witness was called by several professors in the Chemistry Department to come to the Physical Science Building and investigate some problems that they were having, which included the unauthorized use of some laboratories. A Dr. Hollenbeak at that time showed to the witness a lab setup in Room 407 of DeBarr Hall. The witness stated that this lab setup included a heating device, and some sort of solution which was boiling in a flask. Feuerborn further stated that he then remained in the room until the defendant arrived, about three hours later. Officer Feuerborn asked the defendant for identification. The defendant could not produce any, whereupon he was arrested. When arrested the defendant was carrying several publications. One was a chemistry textbook, and another was *The Journal of Medicinal Chemistry*. Officer Feuerborn identified at trial several photographs which had been taken of this lab setup, as well as various chemical containers which had been found at the scene. The witness also stated that after defendant had been arrested, a portion of the solution which had been cooking in the lab was given to Dr. Hollenbeak for analysis.

Dr. Leroy Blank was the State's fourth witness. He too was a professor of chemistry at O.U. He stated that to his knowledge the defendant was not associated with the Department of Chemistry. Dr. Blank also identified one of the bottles seized by Feuerborn as an empty 100 gram container of the chemical 2, 4, 5-trimethoxy benzaldehyde. The witness stated that this was a rare compound, and that to his knowledge he had been the only person on the staff to possess this chemical. He stated that prior to January 15 he had a 100 gram container of this substance.

Next to testify for the State was Bob Hays, a graduate student and teaching assistant in the Chemistry Department at O.U. He stated that he did not know the defendant to be associated with the Chemistry Department, but that on one occasion he had discovered the defendant sitting on the floor of a chemistry storeroom examining a flask containing a quantity of a brown solid substance. When the witness asked the defendant what he was doing, the defendant did not reply but merely left the storeroom.

Dr. Keith Hollenbeak was the State's sixth witness. He testified that he too was a professor of chemistry at the University of Oklahoma. His testimony as to the purpose of Room 407 in DeBarr Hall was corroborative of the other professors who gave testimony. He further stated that it was he who had contacted Officer Feuerborn, showing him the unauthorized lab setup. He further stated that he had analyzed a portion of the solution found in the flask in Room 407, and that it contained two chemicals, 2, 4, 5-trimethoxy benzaldehyde, and nitroethane. He further stated that the lab setup was obviously erected by someone with little or no chemical training. The doctor further testified at length about the chemical structure of 2, 4, 5-trimethoxy benzaldehyde, and its relationship to the substance 2, 4, 5-trimethoxy-amphetamine, which is the drug that the defendant was charged with attempting to manufacture. The witness stated that merely combining 2, 4, 5-trimethoxy benzaldehyde and nitroe-

thane would not produce 2, 4, 5-trimethoxy-amphetamine, but that the results would have to be combined with another chemical to produce it. The witness also stated that the compound 2, 4, 5-trimethoxy benzaldehyde was identical to that which had been contained in the bottle introduced into evidence by Officer Feuerborn and identified by Dr. Blank. The witness also pointed out that an article in The Journal, which defendant had in his possession when arrested, dealt with the synthesizing of psychoactive drugs, and more particularly that the article gave directions for the manufacture of 2, 4, 5-trimethoxy-amphetamine; and further, that the first step in the manufacture thereof would be the combination of 2, 4, 5-trimethoxy benzaldehyde and nitroethane.

The State then called Dr. James Matson, professor of chemistry at the University of Oklahoma, who stated that to his knowledge the defendant was not a student in chemistry at O.U. He further testified that he had accompanied Dr. Hollenbeak and Officer Feuerborn to Room 407 on the afternoon of January 15, in order to inspect the lab setup there. Later that evening he helped Dr. Hollenbeak analyze the solution which was boiling in the flask. The witness further confirmed Dr. Hollenbeak's testimony relating to what the constituent parts of that solution were, identifying them as 2, 4, 5-trimethoxy benzaldehyde and nitroethane. He further stated that combining these two chemicals would produce only one substance which was designated as "E," but not further identified. He also stated that combining E with lithium aluminum hydride would produce 2, 4, 5-trimethoxy-amphetamine, which he stated is an isomer of a controlled dangerous substance, to wit, 3, 4, 5-trimethoxy-amphetamine. Dr. Matson further explained that different isomers of the same substance each have the same number of the same kinds of atoms in their makeup, and the only difference between isomers of the same substance is the way in which the atoms are spatially arranged. This rearrangement will give one isomer somewhat different properties from another isomer of the same substance.

Dr. Matson further testified that he had examined an article in the journal which defendant was carrying at the time of his arrest, and that this article dealt with the manufacture of various psychotomomimetic drugs, including 2, 4, 5-trimethoxy-amphetamine. The witness was shown a sealed chemical container which had been previously introduced into evidence by Officer Feuerborn. He identified the substance as lithium aluminum hydride, which was necessary in the manufacture of 2, 4, 5-trimethoxy-amphetamine.

Furthermore, Dr. Matson testified that because the lab equipment had not been set up correctly the compounds 2, 4, 5-trimethoxy benzaldehyde and nitroethane could never, under those conditions, combine to form the compound designated as "E." He further stated that neither 2, 4, 5-trimethoxy-amphetamine nor 3, 4, 5-trimethoxy-amphetamine was present in the solution contained in the flask.

The State then rested.

Jeffrey Scott Weimar took the stand in his own defense. He denied that he had set up the laboratory equipment in Room 407, stating that he had gone there on the 15th of January merely to be alone and to think. He admitted a certain familiarity with chemical procedures, and also an interest in psychoactive drugs. He further stated that he had read every issue of *The Journal of Medicinal Chemistry,* and that he had been discussing with a friend the article dealing with psychoactive drugs on the night before he was arrested. Defendant also stated that he had originally been charged with attempted manufacture of mescaline, but that the charge had been changed to attempted manufacture of an isomer of 3, 4, 5-trimethoxy-amphetamine. The defense then rested.

■■ Defendant's first assignment of error is that the trial judge erred in refusing to grant a mistrial, when court was reconvened after a short recess and interro-

gation of a witness had begun, before the defendant had been brought down from the jail. The record of this incident, including the motion for mistrial, is contained at pages 46 through 49 of the transcript. Court had recessed during the testimony of Officer Mike Feuerborn because a courtroom was needed to receive a jury verdict in another case. When court was reconvened, the following took place:

"BY THE COURT: Be seated, please. You may continue with direct examination of this witness.

"Q. (by Mr. Rogers) Perhaps to get us all back on the same train of thought we ought to go back and go through a few of the items that you have testified to on your first encounter or first meeting with the Defendant, Jeffrey Scott Weimar.

"BY THE COURT: Excuse me, Counsel. Mr. Bailiff, we need the Defendant.

"BY THE BAILIFF: Sir?

"BY THE COURT: We need the Defendant." (Tr. 46)

Thereafter, defendant moved for a mistrial, which was denied.

Defendant claims that this is reversible error, citing 22 O.S.1971, § 583. This statute requires the presence of the defendant in court at all stages of the trial. In support of his contention that the violation occurred, and that it necessitates reversal, defendant cites *Branham v. State*, Okl.Cr., 480 P.2d 281 (1971). In *Branham*, the defendant had been convicted in the municipal court of Tulsa of committing an act of lewdness. There, as in the instant case, court had reconvened in the absence of the defendant. Upon order of the court, the information was read, and interrogation of the State's first witness was commenced. On appeal this Court held that in a misdemeanor trial the defendant must be present or it must be shown in the record that the defendant had waived this right. Inasmuch as no waiver could be found, the Court reversed the conviction. The defendant herein wishes us to apply that rule in this case, noting additionally that the

statute provides that no waiver of the right to be present can be allowed in a felony case. While this last contention may be true, and while in the present case there may have been a technical violation of the statute, we cannot for these reasons alone reverse the judgment.

It is patent that in order for an error to be reversible there must have been prejudice to the rights of the defendant. Title 20 O.S.1971, § 3001, Harmless error. In the present case we fail to see how defendant's rights were prejudiced when court was reconvened and only a brief preparatory remark made before the defendant's absence was discovered. No questions were propounded, and no arguments were made. Furthermore, in this case the trial judge stopped the proceedings as soon as he realized that something was amiss. In *Branham v. State*, supra, on the other hand, the information had been read and interrogation begun upon the order of the court. By this there seemed to be demonstrated an intent on the part of the trial judge to proceed without the defendant. In the present case the court demonstrated precisely the opposite intent.

Defendant's second assignment of error is that there was no evidence adduced at trial that defendant was attempting to manufacture a controlled dangerous substance, to wit, an isomer of 3, 4, 5-trimethoxy-amphetamine. However, a review of the testimony shows that there was indeed sufficient evidence upon which the jury could base a verdict of guilty.

■ There are three elements required to be proven in order to prosecute an attempt to commit a crime. They are, the intent to commit a specified crime, performance of some overt act towards its commission, and failure of consummation. *Ervin v. State*, Okl.Cr., 351 P.2d 401 (1960).

■ The requisite intent need not be proven by direct evidence, but may be inferred from the circumstances and actions of the parties at the time. *Place v. State*, Okl.Cr., 300 P.2d 666 (1956). Indeed, this

must be so inasmuch as the intent to do or not to do a specific act is entirely subjective, and barring an admission of that intent by the party, could only be proven by circumstantial evidence. In the present case, there is ample evidence from which an intent to manufacture an isomer of 3, 4, 5-trimethoxy-amphetamine may be inferred. When the defendant was arrested he was carrying an article which gave the formula for this substance. On the stand he admitted discussing the article with a friend on the night before his arrest. Furthermore, he admitted an interest in hallucinogenic drugs. He was apprehended in a room where an unauthorized lab had been set up. This lab contained chemicals which were necessary for the production of the drug.

 Intent, however, is not enough. There must be an overt act in furtherance of the commission of the crime. Preparation is not enough. *Booth v. State*, Okl. Cr., 398 P.2d 863 (1964). But here there was more than mere preparation. The chemicals had been mixed and set upon the burner. Dr. Hollenbeak and Dr. Matson testified that combining the chemicals present in the flask was the first step in the manufacture of the drug. The resulting compound, designated "E," would then have to be combined with another substance, lithium aluminum hydride, to actually form the illegal drug 2, 4, 5-trimethoxy-amphetamine, which is an isomer of 3, 4, 5-trimethoxy-amphetamine. The substance lithium aluminum hydride had been found at the scene of the unauthorized lab in a box which contained an empty bottle of one of the chemicals actually present in the boiling solution. Furthermore, the fact that the lab had been set up incorrectly and would thereby prevent any reaction from taking place is irrelevant. It is no defense that the attendant circumstances are not as the defendant believes them to be and they thereby render commission of the crime factually impossible. *Booth v. State*, supra.

Lastly, it is obvious from the testimony adduced at trial that no illegal drug was in fact produced. Consummation of the target crime having failed, and there being introduced at trial competent evidence of the requisite intent and overt act in furtherance thereof, we are of the opinion that the case properly went to the jury. By the rule laid down in many cases, when there is competent evidence tending to show each element of a crime, we cannot disturb the jury's verdict. See, *France v. State*, Okl.Cr., 467 P.2d 526 (1970); *Mitchell v. State*, Okl.Cr., 467 P.2d 509 (1970).

For the foregoing reasons the judgment and sentence is *AFFIRMED*.

BRETT, P. J., and BUSSEY, J., concur.