**Clifton Leroy DRISKELL, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–77–603.**

Court of Criminal Appeals of Oklahoma.

Feb. 16, 1983.

Mac Oyler and Mary E. Bane, Oyler, Smith & Bane, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., Timothy S. Frets, Danny K. Shadid, Asst. Attys. Gen., Oklahoma City, for appellee.

## OPINION

PER CURIAM:

On July 29, 1976, an 11-year old boy was kidnapped in Enid, Oklahoma; the next morning his body was found in a bar ditch outside of Covington, Oklahoma. His throat had been slashed several times. Investigation and arrest of the appellant led to his conviction of Murder in the First Degree for which he was sentenced to death in Garfield County District Court Case No. CRF–76–1084.

## I.

The appellant first alleges error in the district attorney's use of Mr. Stephen Jones, a private attorney, as an assistant prosecutor. Not long after the information was filed, the district attorney sought and obtained an order of the district court appointing Mr. Jones as an unpaid "special prosecutor" to assist in this case. But prior to trial, in *Driskell v. Goerke,* 562 P.2d 157 (Okl.Cr.1977), we held that the Oklahoma statutes do not permit the use of special prosecutors. The district attorney then hired Mr. Jones as an assistant district attorney, with his duties to begin on May 16, 1977, which was the first day of trial of this case.

The appellant insists that regardless of the change of titles, the sole purpose of Mr. Jones' employment was to work on this one case. He rejects the district attorney's claim that Mr. Jones did some work on a federal lawsuit in another county of the district, emphasizing that his employment began on the first day of trial, and that the district attorney admitted the employment would not continue beyond that jury term. The appellant also alleges that Mr. Jones donated his efforts to the case preparation even during the period that he was not officially a member of the district attorney's staff, and that he continued to practice criminal law during the time of his "employment." A member of his law firm made appearances for him in several criminal cases during this period, although no case in which he had made an entry of appearance was tried during the jury term in which the appellant was tried. The appellant further asserts that Mr. Jones did not execute the bond required of assistant district attorneys by 19 O.S.1971, § 215.3, but the district attorney stated he maintained a blanket bond covering whomever he might hire as an assistant.

The attorney general argues that the sole issue in *Driskell v. Goerke,* supra, was the manner in which an assistant prosecutor may be appointed. He asserts that the error in that case was not in *having* a special prosecutor, but in the fact that the district court appointed him instead of the district attorney. The State's argument, however, misses the point of *Driskell v. Goerke.* In that case this Court found that Mr. Jones had, up to that time, been acting in the case as a special prosecutor, "meaning that he had been appointed by the district court *for the special and limited purpose of assisting the prosecution of Clifton Leroy Driskell . . . .*" This Court also emphasized that a mere change of title, from special prosecutor to assistant district attorney, would not be acceptable if the reason for the employment was the temporary increased workload caused by a single case.

The issue is not the manner of employment, the issue is the purpose of employment. If the workload in a district becomes such that a district attorney or his or her assistants cannot manage it, the statutes provide that a district attorney can seek aid

from other districts, 19 O.S.1981, § 215.4; or from the attorney general, 19 O.S.1971, § 215.9.

A district attorney may, of course, employ additional assistants if the need arises, 19 O.S.1981, § 215.15; but from the record before this Court it appears that Mr. Jones was employed for the sole purpose of assisting in the prosecution of the appellant. Although it was improper to have employed Mr. Jones as the State did, it was not reversible error. The appellant has failed to establish any prejudice resulting from Steven Jones prosecuting the case.

## II.

Next the appellant complains of the State's closing arguments during the first stage of the trial. However, during the trial he objected to very few of the passages that he now raises as error. The appellant divides the alleged errors into seven categories, but in three of those categories none of the prosecutors' comments were preserved for review by timely objections.

## A.

■ One category of comments which was preserved is that while the appellant did not present an alibi defense, the State accused him of setting up an alibi, and then showed why that alibi was weak. The appellant asserts that it was easy for the State to find weaknesses in the so-called alibi because the State itself tailored the alibi for that purpose.

It is true that the appellant did not present evidence that would constitute an alibi defense. But during the investigation of the murder he did attempt to account for his whereabouts on the night of the killing. In presenting its case, the State had a right to show any inconsistencies or weaknesses in that account. The comment to which the appellant objects was a fair comment on the evidence.

## B.

■ The appellant also criticizes the prosecutor's repeated references to what he characterized as the appellant's conspiracy theory:

That somehow or other these police officers and the district attorney's office and the state's attorneys and the OSBI and all the other attorneys involved in this have for reasons or motives not elaborated shielded Glenwood Morrison and picked on this poor man that is in the defendant's dock.

Here again, only one comment has been preserved for review. The prosecutor's tone is obviously sarcastic:

Now there's a couple of other things about these fibers that show how we set out to arrest an innocent man. We didn't just rely on Ann Reed, ladies and gentlemen. We had these fibers taken to one of the leading experts in the country. You heard his qualifications. You heard him. You saw him. And he substantiates everything Ann Reed said and as a part of our conspiracy, ladies and gentlemen, to arrest this innocent man, their own expert came to the laboratory and examined them.

But in view of the appellant's own closing argument, the comment cannot be considered improper. Although he may not have needed to do so as frequently and vigorously as he did, the prosecutor was entitled to comment on this inference.

## C.

The third category in which closing comments were preserved involves references to a previous incident in which the appellant kidnapped a child in Tonkawa, Oklahoma. This issue is discussed in the fourth assignment of error.

## D.

The last category of complaints which were properly preserved pertains to prosecutorial argument of facts not in evidence. Only one comment in this area merits discussion, as most of the arguments raised were either not preserved or were legitimate inferences drawn from the evidence which was admitted. The exception was the following statement:

The second thing to bear in mind is that he had a history, a lifelong obsession which he has acted out numerous times, if we can believe Dr. Prosser, of tying up young boys. He has literally lived out his fantasy.

There was evidence presented to the jury to the effect that when the appellant was a child he had played games with other children his age in which they would tie one another up. But the prosecutor's comment implies that he continued these activities into adulthood. The statement was not supported by the evidence, however we do not find it so prejudicial as to require reversal.

### III.

■ During his opening remarks to the jury panel, the trial judge told the prospective jurors that the burden of proof lay entirely with the State to prove the appellant guilty beyond a reasonable doubt, and that the appellant did not have to say anything or to present any evidence. The appellant immediately moved for a mistrial on the basis of 22 O.S.1981, § 701. The motion was denied. Jury instructions on a defendant's right not to take the stand have been the subject of two recent cases in the United States Supreme Court. In *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978), the Supreme Court held that it was not a violation of the Fifth Amendment for the trial judge to give a cautionary instruction over the defendant's objection. And, in *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the court held that it was a violation of the Fifth Amendment to refuse such an instruction when the defendant requested it, even though Kentucky had a statute prohibiting comments on a defendant's failure to take the stand.

Both of these cases are progeny of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), rehearing denied, 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730, which forbade comment on a defendant's failure to take the stand. They explain that the holding of *Griffin* pertains only to *adverse* comments:

[The instruction's] very purpose is to remove from the jury's deliberations any influence of unspoken adverse inferences. It would be strange indeed to conclude that this cautionary instruction violates the very constitutional provision it is intended to protect. *Lakeside v. Oregon*, supra, 435 U.S. at 339, 98 S.Ct. at 1095.

Title 22 O.S.1981, § 701, gives the defendant a choice of testifying or not:

In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this State, the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor be mentioned on the trial; if commented upon by counsel it shall be ground for a new trial.

The proscription on mentioning the failure to testify, however, is limited to mention by counsel. The instruction given by the trial judge was not a violation of the statute, nor was it constitutionally infirm.

### IV.

■ Perhaps the most damaging evidence introduced against the appellant was evidence of another crime he had committed five years earlier. The appellant strenuously argues that the trial court committed reversible error when admitting evidence of the prior criminal act.

On September 30, 1971, the appellant kidnapped a nine-year-old boy in Tonkawa, Oklahoma. He bound and gagged the child, drove him into the country and left him at the side of the road. The boy was not harmed. The appellant pleaded guilty to child stealing and the imposition of the judgment and sentence was deferred for two years. At the end of two years the case was dismissed.

Seeking to prevent the introduction of the earlier offense, the appellant filed a motion in limine. At a pretrial hearing, the

State argued that the Tonkawa incident was admissible under the identity exception to the rule barring evidence of other crimes; but the district court ruled that there was not enough similarity between the crimes to justify the admission of the earlier offense. During the trial, however, the trial judge allowed the introduction of the offense after an in-camera hearing at which the State presented expert testimony. The State then put before the jury, over appellant's objection, the evidence of the earlier Tonkawa kidnapping, and stressed it again in closing argument.

■ The appellant first advances that the evidence should not have been introduced because he had completed his probation, and hence there was no conviction. This argument is readily dismissed, for even though there was no conviction, there was still an act committed. A conviction is not a prerequisite to the admission of evidence of another crime.

He next contends that the Tonkawa kidnapping did not fall within any of the recognized exceptions to the rule barring evidence of other crimes. Title 12, Section 2404(B), carries forward into the Evidence Code the established rule of law providing:

> Evidence of other crimes or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

■ The disposition of this issue rests on whether the Tonkawa incident was properly admitted under the common scheme or plan exception. Evidence of other crimes is admissible if there was a "plan" to commit a series of crimes or if the evidence of other crimes establishes a "signature." In this case, the State attempted to show that the appellant's mode of operation in the Tonkawa incident was so unusual and distinctive that it acts as a signature of the appellant.

In *Rhine v. State,* 336 P.2d 913 (Okl.Cr. 1958), this Court addressed the application of the common scheme or plan exception in regard to sex offenses. Quoting from early Pennsylvania and California decisions this Court held:

> 'That evidence of the commission of other similar crimes may be given to show the *plan* or *design* on the part of the defendant to commit such crimes has often been judicially recognized. The word 'design' implies a plan formed in the mind. That an individual who commits or attempts to commit abnormal sex offenses is likely to have such a mental 'plan' finds recognition in the fact that when a defendant is charged with the commission of sexual offense the law is more liberal in admitting as proof of his guilt evidence of similar sexual offenses committed by him than it is in admitting evidence of similar offenses when a defendant is charged with the commission of non-sexual crimes. . . .
>
> 'But where the prior rape or attempt is committed under circumstances remarkably similar to the one charged the evidence is admissible to show a plan or scheme to commit the crime in that fashion, even though the prior rape or attempt was committed on a person other than the prosecutrix. In such cases the evidence that defendant committed the prior offense tends to prove that he committed the offense charged.'

More recently, in *Hall v. State,* 615 P.2d 1020, 1022 (Okl.Cr.1980), we asserted that the common scheme or plan exception is dependent upon the "relationship or connection between the crime charged and the crime or crimes sought to be admitted. Similarity between crimes, without more, is insufficient to permit admission." (citations omitted.) In *Hall* we explained that the relationship between the crimes must "infer the existence, in the mind of the accused, of a plan or scheme with each crime comprising a part thereof." This Court further asserted that "[t]he commission of separate offenses characterized by a highly peculiar method of operation will suffice to show a common scheme." See also *Jett v. State,* 525 P.2d 1247 (Okl.Cr. 1974); and *Hall v. State,* 528 P.2d 1117 (Okl.Cr.1974).

In this case, there is a substantial degree of similarity between the Tonkawa incident and the killing of the Enid youth. The peculiar method of operation to characterize a common scheme can be summarized as follows:

A. Both cases involved abduction of caucasion boys of similar age.

B. Neither case involved a ransom request.

C. Both crimes were committed in the evening hours.

D. Both victims were abducted after baseball games.

E. Both victims were abducted in the vicinity of a Safeway store.

F. Both victims' hands were tied in an unusual manner, i.e., their hands were crossed and tied behind their backs.

G. Both abductions were conducted on the last day that the appellant was in town after an auditing job.

H. Both victims were driven out into a rural area toward the general direction of Oklahoma City.

I. Both victims were abandoned along the side of a rural road.

During an in-camera hearing the State introduced expert medical testimony in an attempt to establish the critical relationship or connection between the Tonkawa incident and the instant criminal episode. Dr. Rupp, an anatomic and forensic pathologist, who lectures regularly on sex crimes and sex related deaths and has written several articles on the subject, testified about the possible connection between the two crimes. He initially stated that child abductions with sexual overtones are uncommon crimes. In regard to his opinion about the possible relationship between the Tonkawa incident and the crime at issue, Dr. Rupp testified:

Well, I would relate them in that the sex criminal of this type, that is interested in children, they tend to develop a pattern. They don't start out for instance as killers. They will start out by an abduction or a tying up or a play and then as time progresses and this activity progresses the agressive nature also progresses just like the fantasy elaborated. It would be very unusual, for instance, for a person to suddenly after no apparent sexual activity, now I don't mean fantasies, but I mean actual carrying out some activity with another person, would suddenly abduct a boy and kill him to work out a fantasy. The fact that this type of behavior is present in the suspect's past, but to a limited degree, that there was no killing as far as we know prior to this particular crime is very important to establish because as I said it is almost unheard of for an individual to suddenly kill another individual in this fashion without some sort of preceding activity.

Dr. Rupp based his opinion on a hypothetical question which described the appellant's previous activities and psychological treatment. We find that the highly unusual pattern of behavior in the Tonkawa incident and the present case is sufficient to establish a connection between the two crimes to show a common scheme or plan. The similarities between the Tonkawa incident and the present criminal act are striking. The two crimes parallel in time, location, method of abduction, victims, and motive.

The next crucial issue bearing upon the admissibility of the Tonkawa incident is whether the five year period between the crimes renders it too remote. In *Hall v. State,* supra at 1120, this Court held "that evidence of the commission of other offenses is admissible to show common scheme, plan, or unlawful intent *only if such offenses are not too remote in time* and there is a visible connection between them and [the] offense charged." In regard to the remoteness issue the trial court, in camera, heard extensive expert testimony. We find that the trial court did not abuse its discretion by allowing introduction of this evidence in ruling that the Tonkawa incident was not too remote in time. We further uphold the trial court's ruling that probative value of the evidence pertaining to the Tonkawa incident outweighed its prejudicial impact.

## V.

The next four assignments of error relate to alleged violations of the appellant's doctor-patient privilege. After the Tonkawa incident occurred, the appellant began therapy sessions at a psychotherapy clinic in Oklahoma City. While the Enid murder was being investigated, he executed a waiver allowing his two doctors to talk about his case with his attorney and with the investigating authorities. Three days later he revoked the waiver, but during those three days the doctors had talked with the authorities. When the trial was held, the doctors were called as State witnesses, and testified to the extent they had already given information.

The relevant statute is Laws 1953, pg. 52, § 1:[1] as follows:

The following persons shall be incompetent to testify:

6. A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, or any knowledge obtained by a personal examination of any such patient: ....

The appellant argues he merely gave his doctors permission to speak to the officers investigating the murder, and that this should not be taken as a waiver of his privilege to prevent his doctors from testifying. He maintains that one should be able to cooperate with a police investigation without jeopardizing subsequent rights as a criminal defendant.

Defense objections to the doctors' testimony were overruled. The appellant contends that given the trial court's refusal to prohibit the doctors' testimony, there should have been an in-camera hearing to determine what information was revealed to the police during the effective period of the waiver and what may have come out at other times. The appellant offered to prove that the doctors had communicated with the police both before the waiver was executed and after it was revoked; but the trial court refused his request for a hearing.

Failing to obtain an in-camera hearing, the defense asked that at least the doctors be required to testify to the specific date, time, and location of the conversations which occurred while the waiver was in force. The trial court refused this, also.

The appellant assigns the above rulings as error; in addition he claims that state officers approached the doctors before the waiver was executed and asked them to get specific information from the appellant. The appellant concludes that the doctors were acting as agents of the State when they were given that waiver, making his statements to them admissions obtained in violation of his right to counsel.

### A.

The State is wrong in its initial claim that Oklahoma had no psychotherapist-patient privilege before the present code of evidence was enacted in 1978. See *Noyes v. State,* 516 P.2d 1368 (Okl.Cr.1973). However, there is merit in the State's argument that the appellant had waived his privilege.

While it is true that the appellant had the privilege to prevent his doctors from testifying, that privilege could be and was waived. As noted in *Williams v. State,* 65 Okl.Cr. 336, 86 P.2d 1015 (1939), the purpose of the doctor-patient privilege is to protect the right of privacy. When the appellant gave his doctors permission to discuss his case with the police officers, the confidentiality of his communications with his doctors was lost. There was no longer any privacy to protect.

### B.

Nor do we find error in the trial court's refusal to hold an in-camera hearing or to require the doctors to specify the time and place of their conversations with officers. The testimony presented at the preliminary examination established that the investigating officers had several conversations with

---

1. The statute was codified as 12 O.S.1971, § 385, but was repealed in 1978 when the Code of Evidence was enacted.

the doctors outside the period of the waiver. Nothing was presented as to the content of these conversations, however, and both doctors were told by the magistrate that they could testify only to those things which had been disclosed while the waiver was in effect.

Due to his health, Dr. Prosser was unable to testify on behalf of the State during the trial. As a consequence the jury was read an edited version of his preliminary examination testimony. In that testimony the prosecutor repeatedly framed his questions with reference to the waiver: "Did you tell the officers . . . ?" The prosecutor used the same approach in questioning Dr. Savage. It is clear from their answers that both doctors understood the limits placed upon their testimony. Under the circumstances, an in-camera hearing was not necessary.

As for when and where the doctors talked to the investigators, it was sufficient for admissibility purposes that the doctors testified the disclosures were made during the period of the waiver. If the appellant wanted more specificity he could have inquired on cross-examination.

### C.

There is no merit in the appellant's argument that his doctors were acting as agents for the State when he talked to them. He claims that after the State focused on him as a suspect, officers gave Dr. Prosser a list of questions to which they wanted answers; and he implies that the doctors then hospitalized him for the purpose of obtaining those answers.

The record, on the other hand, shows that the consultations with the doctors were initiated by the appellant, who went to them and asked to be questioned about the murder. Also, it must be remembered that the appellant had already obtained the assistance of counsel, and that in fact had his attorney present at the time the waiver was executed.[2]

*People v. Leyra,* 302 N.Y. 353, 98 N.E.2d 553 (1951), on which the appellant relies, is distinguishable. In that case, the accused was in continuous custody, and the police brought a doctor to the police station. Such action did not appear in the instant case.

Finally, it is unreasonable for the appellant to assert that the disclosure to the officers constituted an unlawful search and seizure, when he executed a waiver authorizing disclosure.

### VI.

The appellant's ninth and tenth assignments of error raise a number of procedural issues relating to the testimony of Dr. Prosser. When it became known that the doctor had undergone heart surgery and would not be able to appear, the appellant moved for a continuance. The motion was denied. Subsequently, the State's motion to use the doctor's testimony from the preliminary examination was granted. A week and a half later, when the appellant began presentation of his case, Dr. Prosser became available to testify. After a brief discussion, it was agreed that the appellant, whose objection to the use of the preliminary examination testimony was that he had not had a sufficient opportunity for cross-examination, would present Dr. Prosser as his witness. The appellant, however, would be allowed to conduct the type of questioning normally reserved for cross-examination. During his questioning the appellant elicited testimony which conflicted with the preliminary examination testimony presented to the jury. The State then tried to reinforce its case by introducing prior statements of the doctor which were consistent with his preliminary examination testimony. The appellant objected to this procedure on the ground that the State was seeking to impeach its own witness, and that objection was overruled.

The appellant's complaint in regard to the trial court's refusal to grant a continuance became moot when Dr. Prosser was

---

**2.** See *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which the Supreme Court held that an accused must be advised of his Fifth Amendment rights prior to pretrial psychiatric examination.

able to appear and testify. Similarly the argument that the State failed to sufficiently establish Dr. Prosser's availability before using the preliminary examination testimony cannot be legitimately advanced by the appellant when he, too, alleged the doctor's unavailability in his motion for a continuance.

The appellant's allegation that the trial judge withdrew his order allowing cross-examination of Dr. Prosser is unfounded. The transcript shows that there was a clear understanding that the appellant could ask leading questions and in general conduct a cross-examination of the witness. The transcript also shows that the appellant was allowed to conduct exactly the type of examination of Dr. Prosser that he wanted, during which time there was not a single objection by the State.

We are not required to decide the question of the State impeaching its own witness. Assuming for the sake of argument that it happened, it would have been improper under the rules of evidence in force at the time of this trial. *Mackey v. State,* 526 P.2d 1161 (Okl.Cr.1974). But it would be an exercise in futility to remand the case for a new trial solely because of that alleged error, since a new trial would be conducted under the rules of evidence adopted in 12 O.S.1981, §§ 2101 et seq., wherein a party may impeach its own witness. 12 O.S.1981, § 2607.

### VII.

The appellant also raises an unrelated issue in his tenth assignment. He argues it was error for the trial court to require him to make an offer of proof revealing his case before he presented his evidence, while not requiring the same of the State. This allegation is not supported by the record.

When the State rested, it moved to have the appellant's opening argument restricted because it believed that the appellant was going to attempt to place the blame for the crime on a third person—Glenwood Morrison. When this is done, a defendant must be able to show some overt act connecting the third person to the crime, *Case v. State,*

555 P.2d 619 (Okl.Cr.1976); the State asserted at trial that it did not believe the appellant could make the required showing. The record shows no ruling on the motion and the appellant's opening argument was unrestricted.

Later, when the appellant reached the point in his case where he was about to begin presenting evidence implicating Glenwood Morrison, the State raised the question again. At an in-camera hearing, the appellant informed the trial court that his evidence would be based on the affidavit the State used to obtain a warrant to search Morrison's house and car. He presented nothing which was not in the State's possession.

The appellant then asked to have the State reciprocate by detailing what it would present in rebuttal. The State obliged. The appellant did not believe the State's offer of proof was sufficient; he complained that he had been much more specific than the State had been. The trial court observed, however, that the appellant's only specificity had come from the affidavit for a search warrant; that both parties had outlined the evidence they intended to present and there was no need to go any further. This Court upholds the trial court's ruling.

### VIII.

The next three assignments are treated together because they share a common flaw. In the eleventh assignment of error, the appellant objects to the mention of sodium pentothal during the testimony of the two psychiatrists. The twelfth assignment is that the testimony of the psychiatrists involved their personal opinions of the appellant's guilt and evidence of his state of mind. And the thirteenth assignment is that through the doctors' testimony the State presented evidence of the appellant's character, even though he had not yet put his character in issue. None of these questions is properly before this Court, however, because none of them was presented to the trial court for a ruling. At no time during the State's examination of

these two witnesses did the appellant object on any of the above grounds.

## IX.

The appellant argues that the probative value of four color slides (State's Exhibits 34A, 34B, 34C, and 34E) of the victim was outweighed by their prejudicial effect. He also claims these slides were repetitive of the 8″ × 10″ black and white photographs already introduced at trial. We agree. Three of the four color slides showing the gaping neck wound and almost total decapitation of the victim, were cumulative. The color slides were also repetitive of the color photographs.

The applicable test for the admissibility of such demonstrative evidence was enunciated by this Court in *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.1958):

> . . . if the pictures of a homicide victim made subsequent to his death are gruesome or ghastly, and carry danger of prejudice, they are inadmissible unless they are relevant to some material issue and would reasonably assist the jury in the determination of the defendant's guilt, and this relevancy must outweigh the danger that the jury would substitute emotion for reason as a basis for their verdict.

Although we have no problem in concluding that the slides were relevant, we find no justification for the incredible duplication. See *President v. State,* 602 P.2d 222 (Okl.Cr. 1979).

## X.

The appellant challenges the introduction of Exhibit No. 12, two microscopic blue fibers found on the victim's jeans, and Exhibit No. 13, a partial strand of hair found on the victim's undershorts. He claims that the chain of custody was improper and the integrity of the evidence was violated.

The primary objection to the introduction of this evidence was Deputy Burnett's handling of the victim's clothing, from which the fibers and the hair were later removed. Dr. A. Jay Chapman, the State Medical Examiner, had carefully removed the clothing from the victim and sealed the evidence in airtight plastic bags and initialed them. This was done in order to preserve the integrity of any trace of microscopic evidence. Dr. Chapman delivered the evidence to Deputy Burnett, who then transported this evidence to Enid. There, he removed the clothing from the plastic evidence bags and hung them unprotected in the police evidence room.

The clothing hung in the evidence room from July 30, 1976, until August 5, 1976. The clothes remained exposed for this entire period and were accessible to a number of persons. On August 5, Burnett placed the clothes in a grocery bag for transportation to Ann Reed at the Oklahoma State Bureau of Investigation. Burnett was unable to recall whether he had placed the evidence in a new or used grocery bag.

The purpose of the chain of custody rule is to insure that the evidence introduced at trial is in substantially the same condition as when it was obtained. Law enforcement officers are required to take reasonable precautions to preserve the original condition of the evidence. The State must lay a foundation showing that the evidence offered is in substantially the same condition as when the crime was committed. However, the State is not required to exclude all possibilities of alteration or tampering before the evidence is admissible. *Atkins v. State,* 572 P.2d 1298 (Okl.Cr.1977). The State must, however, convince the trial judge that in reasonable probability the evidence has not been changed in any important aspect. The trial judge's determination will not be overturned unless there is a clear abuse of discretion.

The trial judge, in determining whether the State has laid an adequate foundation, should consider: (1) the nature of the article; (2) the circumstances surrounding its preservation; and, (3) the likelihood of contamination, alteration or tampering. If the article offered is susceptible to alteration or improper preservation the judge can require a more exhaustive foun-

dation. To have evidentiary value the article must be preserved in its original condition and be protected against contamination.

In this case, we find that the careless handling of the victim's clothing created an unreasonably high probability that the evidence was contaminated. The State has not adequately shown that the fibers and the hair taken from the victim's clothing were on the victim's clothing at the time of the commission of the crime. We therefore hold that the evidence of the two blue nylon fibers and the strand of hair was too highly speculative to be of any probative value and should not have been admitted. See *Benton v. State,* 86 Okl.Cr. 137, 190 P.2d 168 (1948).

### XI.

In view of our disposition of the preceding Proposition No. 19, in which we find that the break in the chain of custody rendered the evidentiary value of the blue nylon fibers and hair comparison too speculative to be admissible, we do not need to discuss appellant's Proposition Nos. 20, 21, or 23. These propositions also challenge the admissibility of the hair samples and blue fibers.

### XII.

The appellant further claims that the trial court erred in admitting into evidence two red fibers. One red fiber, which was found under the victim's fingernail, was microscopically compared with another red fiber found in the appellant's car. It is first contended that the chain of custody of one of the red fibers was broken. Secondly, it is contended that the probative value of the fibers was outweighed by their prejudicial effect because the fibers were too small and their source of origin too speculative.

In regard to the chain of custody, we find that the State laid a sufficient foundation for the admission of the red fibers. The red fiber in question was found under the fingernail of the victim. Dr. Chapman clipped the victim's fingernails at the time of the autopsy. After clipping the fingernails he placed them in an envelope. The envelope was then sealed and initialed. Dr. Chapman delivered the envelope with the clippings to Deputy Burnett. Burnett transported the envelope with the fingernail clippings to Enid, where he placed them in the evidence locker. Several days later Burnett delivered the sealed envelope to Ann Reed of the Oklahoma State Bureau of Investigation. Reed removed the fingernail clippings from the sealed envelope and examined them under a microscope and found the red cotton fiber.

It is not necessary for the State to exclude every possibility of tampering before evidence is admissible, only to show that it is reasonably certain that a substitution or tampering did not occur. *Richards v. State,* 569 P.2d 461 (Okl.Cr.1977). In this case, there is absolutely no evidence of a substitution or tampering with the envelope containing the victim's fingernail clippings.

### XIII.

We now turn to the crucial inquiry as to whether the trial court erred in allowing two expert witnesses to testify about their microscopic comparisons of the red fibers.

The admissibility of fiber analysis tests has not been directly addressed by this Court. However, we find that an analogy can be drawn to the introduction of hair samples. Both hair and fiber analysis tests require microscopic comparison of two or more samples to test similarities or dissimilarities. The value of hair analysis has been addressed in many jurisdictions, a majority of which allow expert testimony concerning hair samples. Several jurisdictions have upheld the admissibility of expert testimony of fiber analysis. *State v. Hall,* 297 N.W.2d 80 (Iowa 1980); *State v. McClain,* 216 Kan. 602, 533 P.2d 1277 (1975); and *State v. Square,* 257 La. 743, 244 So.2d 200 (1971).

In this case, the State's expert witness, John Delly, is a microscopist at the McCrone Institute in Chicago. He has studied the characterization and identifica-

tion of materials for the past twelve years. He testified that he conducted numerous tests on the two red fibers. First, he viewed the fibers through a microscope to determine their morphology (i.e., size, shape, structure, and visible contents). He then tested and compared the refractive indexes of the fibers. Delly also performed a microscopic comparison of the fibers' colors. Based upon these tests he concluded that the two fibers were red cotton fibers having substantially identical microscopic characteristics.

The trial judge is allowed broad discretion to determine the qualifications of expert witnesses and to determine whether their testimony is needed to assist the jury. *Barnhart v. State,* 559 P.2d 451 (Okl.Cr. 1977). The trial judge's decision will not be disturbed unless there is a clear abuse of discretion.

At bar, Delly's expert opinion was relevant. The fact that the two red fibers were substantially identical tended to show that the red fiber found under the victim's fingernail may have come from the appellant's car. Delly was properly qualified as an expert witness and based his opinion on generally accepted scientific procedures. Any questions about the procedures and conclusions drawn therefrom should be raised on cross-examination. The weight given to the expert's opinion is for the jury to determine.

■■■ We acknowledge, however, that not all scientific evidence should be admitted in a criminal trial. Scientific evidence "must be sufficiently established to have gained general acceptance in a particular field ..." *Frye v. United States,* 5 App.D.C. 46, 293 F. 1013 (1923). Expert opinion without a generally accepted scientific basis may be given undue weight by the jury, thereby denying the defendant a fair trial.

### XIV.

■■■ The State also introduced enlarged color photographs of the red cotton fibers. The appellant claims that the trial judge erred in admitting these photographs. The photographs were identified by Ann Reed,

forensic scientist, as being a true and accurate depiction of what the fibers looked like under a microscope. Reed had taken the photographs of the fibers with special photographic equipment attached to her microscope. We find that there was a sufficient foundation laid for the introduction of these photographs. See *Hainta v. State,* 596 P.2d 906 (Okl.Cr.1979).

### XV.

■■■ The appellant contends as his twenty-sixth assignment of error that the trial court abused its discretion in overruling his motion to individually voir dire all jurors outside the presence of the rest of the jury panel. The appellant, in support of his argument, relies heavily upon the American Bar Association Standards Relating to a Fair Trial and Free Press. This precise issue has been addressed by this Court. In *Irvin v. State,* 617 P.2d 588 (Okl.Cr.1980), this Court held:

> We deemed unnecessary a lengthy discussion of this claim of error. Relied upon are the American Bar Association Standards Relating to a Fair Trial and Free Press, and a number of cases, including *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). No authority, however, has been brought to the attention of this Court, nor have we found any, *mandating* that individual voir dire be allowed under any circumstances. To the contrary, this Court, when presented with the identical proposition of error, stated in *Vavra v. State,* Okl.Cr., 509 P.2d 1379 (1973), that the individual examination of prospective jurors was within the discretion of the trial court. We hold this case is dispositive of the issue. [Footnote omitted.]

In *Morrison v. State,* 619 P.2d 203 (Okl. Cr.1980), we reiterated our holding that whether private individual voir dire should be conducted is a matter for the discretion of the trial court. In *Morrison,* we further declined to impose a mandatory requirement of private individual voir dire. We

did, however, agree with *Silverthorne v. United States,* 400 F.2d 627 (9th Cir.1968), upon which the appellant relies, that in cases involving juror exposure to prejudicial publicity, individual voir dire may be very useful. The trial judge in the instant case did a commendable job of conducting voir dire with these guidelines in mind.

Counsel was allowed to question potential jurors as to whether or not they had been exposed to and recalled any significant pre-trial publicity involving this case and/or this appellant. If they answered in the affirmative, the trial judge allowed voir dire of that juror to be conducted privately in his chambers on the issue of pretrial publicity. Of the twelve jurors empaneled in this case, ten were individually and privately voir dired. The remaining two jurors, when questioned individually about their exposure to pretrial publicity concerning this case, revealed to the trial court's satisfaction that any exposure had been minimal and insignificant. The trial court found that a special in-camera voir dire session on this subject was not necessary. To the contrary of appellant's contention, we find that the trial court conducted a model voir dire in which there was no abuse of discretion.

## XVI.

The appellant next alleges the trial court abused its discretion in overruling his motion for change of venue. As this was the appellant's motion, it was his burden to come forward and produce supporting evidence. Thereafter the decision to grant or deny the motion was within the trial court's discretion. Absent a showing of abuse of discretion, such ruling will not be disturbed on appeal. *Frye v. State,* 606 P.2d 599 (Okl.Cr.1980); *Hammons v. State,* 560 P.2d 1024 (Okl.Cr.1977); *Sam v. State,* 510 P.2d 978 (Okl.Cr.1973).

A timely motion for change of venue was filed in this case and an evidentiary hearing was conducted on the merits of the motion. The appellant presented as evidence seven affidavits in which persons swore that they did not believe the appellant could obtain a fair trial in Garfield County; the testimony of a radio owner and manager who broadcast six months prior to the trial for two days an editorial concerning the appellant and the judicial system; newspaper clippings; and the testimony of a banker concerning a fund being raised for the victim of this crime.

The State proceeded to show that not all of the affidavits bore proper signatures and that some of the persons allegedly signed the affidavits as a favor to either their pastor or the appellant's father and had no basis for stating that they did not think the appellant could receive a fair trial in Garfield County.

The trial judge at the close of the hearing stated:

> With regard to the press coverage of this case the Court has read and considered all the exhibits attached to the application. It does not appear in any of the newspaper clippings, that they are of a prejudicial nature. They appear to be factual, objective reporting . . . (the articles do) not appear to indicate an opinion as to the guilt of any person . . .

> \*   \*   \*   \*   \*   \*

> Going a little further, a purported editorial by one of the local radio stations . . . did attempt to influence opinion, which would have been quite prejudicial to this defendant if it were shown that any substantial portion of the prospective jurors of Garfield were influenced thereby, but there has been no such showing.

> Frankly, the Court is amazed at the lack of evidence with regard to the motion for change of venue . . . The motion for change of venue is denied and overruled. I remind everyone, however, this is always a possibility, when we do get to the point of selecting jurors—that's the . . . final test. If a jury cannot be selected from the citizens of Garfield County, then it is obvious I . . . will have to change this ruling but, on what has been shown at this time, the change of venue is denied.

Our review of the evidence presented during the hearing held on the motion to change venue shows that the trial court did not abuse its discretion in denying the motion. We conclude that his findings as stated in the record were supported by the evidence and decline to disturb this ruling.

## XVII.

■ The appellant's twenty-eighth assignment of error is two-fold. First, he argues that Judge Swanson erred in overruling a motion to disqualify himself from presiding over this case. Although Judge Swanson did overrule the motion to disqualify on the grounds that the appellant had failed to present sufficient evidence in support of the motion, he chose to step aside and discontinue presiding over this case. We have carefully reviewed the evidence presented in support of the motion to disqualify Judge Swanson and find it to have been totally insufficient. In *Stokes v. State*, 366 P.2d 425, 431 (Okl.Cr.1961), we held:

> Prejudice, ill will and hostility towards a defendant on the part of a trial judge must be of such character as to prevent the judge from giving the defendant a fair trial before the same will constitute grounds for disqualification of such judge. Captious and unwarranted accusations of bias should be discouraged.

We are of the opinion that the defendant made a trivial accusation of prejudice on the part of the judge, and find no error in Judge Swanson's overruling of the motion to disqualify. His further action of stepping aside was purely a personal choice which, in his judgment, would totally cure any claim of error the appellant may have concerning his presiding over this case. This act effectively granted appellant's motion to disqualify and renders moot the appellant's allegation that he was prejudiced.

Secondly, the appellant contends that the trial court abused its discretion in overruling his renewed motion to change venue. At the conclusion of the second hearing on the issue of venue, the trial judge reserved ruling on the motion until after voir dire. As stated previously, the voir dire was conducted in a model fashion. We believe that a fair and impartial jury was selected from Garfield County. Accordingly, we do not find that the trial court abused its discretion in refusing to grant the motion to change venue.

## XVIII.

■ The appellant alleges the jury panel was improperly selected. However, the appellant failed to comply with 22 O.S.1981, § 634, which states as follows:

> A challenge to the panel must be taken before a jury is sworn, and must be in writing, specifying plainly and distinctly the facts constituting the ground of challenge.

Such a requirement for specifically presenting to the court the basis for objection to the jury panel at or before the time the jury is sworn to try the case, is also established in 38 O.S.1981, § 29. The appellant's failure to so comply with the requirements of the above statutes waives his right to challenge on appeal the selection of the jury panel. *Stuart v. State*, 522 P.2d 288 (Okl.Cr.1974), *Johnson v. State*, 559 P.2d 466 (Okl.Cr.1977).

## XIX.

■ The appellant alleges as his thirty-first assignment of error that Ms. Steen was improperly allowed to testify that the appellant looked familiar to her. Before she so testified, an incamera hearing was held to determine the basis of her "identification." During the hearing she testified that she worked as a cashier in Safeway and had waited on the victim the night he was abducted. She testified that the police later visited her on two occasions to inquire if she recognized a picture they had of the appellant.

She testified that they did not show her a lineup of photographs, asking her if she recognized any of the people, but rather only showed her a picture of the appellant. The State countered this testimony with police testimony but could produce no rec-

ords of other pictures allegedly shown to Ms. Steen. She stated that she could not make a positive identification of the appellant, but only could testify that he looked familiar to her. She was not able to testify as to where or when she thought she had seen him before. She could not even narrow her testimony down to if her alleged previous contact with the appellant occurred in Safeway.

The probative value of her testimony was weak at best. In addition, her testimony was tainted by having been twice shown a single photograph of the appellant. To overcome such taint, the witness's prior contact with the appellant needs to be examined to determine if she could identify the appellant even without having been twice shown the single photograph. In this case, however, the witness could not even positively state that she had previously seen the appellant. Therefore, no way exists to balance the amount of time she previously spent with the appellant, the lighting conditions, the circumstances, and other pertinent factors, with the taint of the improper showing of the appellant's photograph. See *Hays v. State,* 617 P.2d 223 (Okl.Cr.1980).

When this taint, combined with the vagueness of her "identification," is balanced against the prejudicial effect of her testimony, it becomes clear that her testimony should have been excluded from the jury's consideration. As she was a clerk at Safeway, her "identification" of the appellant would tend to link the appellant with the store which is the alleged general scene of abduction. The prejudicial effect of such testimony is obvious and in light of its negligible probative value, Ms. Steen's testimony should have been excluded. Error occurred when the jury was allowed to consider her testimony.

## XX.

### A

It is next alleged that Ms. Sibit's in-court identification of appellant was improperly admitted into evidence. With this contention, we do not agree. An in-camera

hearing was held in which it was revealed that Ms. Sibit had seen the appellant on three occasions, once on July 28, and twice on July 29, 1976, sitting in a blue car wearing a suit and a tie. On each occasion, the car was parked near the driveway of her brother-in-law's apartment.

On July 30, 1976, police officers came to her residence and showed her approximately five photographs. They asked her if she recognized any of the persons in the photos. From the photographs, she selected one of the appellant. The police and O.S.B.I. later flew Ms. Sibit to Arnett, Oklahoma. They went to a restaurant in which there were approximately seventy-five persons. Ms. Sibit was asked if she saw the person whom she had previously identified seated anywhere in the restaurant. She pointed out the appellant. Her description of the person she saw in the car has remained consistent from the beginning.

The appellant does not allege on appeal that the photographic lineup was improperly conducted nor does he allege error in the manner in which Ms. Sibit identified the appellant in the restaurant. He simply argues that the witness's previous opportunity to view the appellant while he allegedly was in his car, was not sufficient to form a basis from which to make an in-court identification. Based upon a reading of the witness' testimony, we disagree. See *Cooper v. State,* 599 P.2d 419 (Okl.Cr.1979).

The appellant has shown no taint on Ms. Sibit's identification. We believe that the witness was able to testify at the incamera hearing to a sufficient amount of encounters with the appellant to make her testimony probative. The degree to which her testimony is to be considered to have merit was up to the jury. Accordingly, we find her testimony was properly placed before the jury and no error occurred.

### B

The appellant also includes in this argument that the trial court erred in refusing to give his written requested instruction on eye-witness identification. In light of the fact that the trial court allowed Ms.

Steen's "identification" to go to the jury, even though she could only say that he looked familiar to her from some unknown previous time and place, the requested instruction, or one similar to it, should have been given.

In *Roberts v. State,* 620 P.2d 425 (Okl.Cr. 1980), and *Hall v. State,* 565 P.2d 57 (Okl. Cr.1977), we emphasized that when the eye-witness testimony is positive and unequivocal, an instruction that eye-witness testimony should be carefully scrutinized is unnecessary and may even be confusing. However, in a case such as this where eye-witness testimony is far from positive such an instruction should be given.

## XXI.

■ The appellant contends that the State was improperly allowed to introduce into evidence photographs of the appellant's hotel room with a newspaper wedged in between the door knob and the door facing. Mr. Don Thrower testified that he worked with the appellant on the day that the victim was abducted. He stated he and the appellant were staying at the same hotel and that they left work at 4:20 p.m. that day. He returned to their hotel but the appellant did not at that time.

Mr. Thrower testified that his hotel room was next door to the appellant's. In the evening, it was customary for the hotel personnel to place a newspaper in between the door knob and the facing of their patrons' doors. Mr. Thrower testified that he walked outside after midnight Thursday evening, July 29, 1976, and noticed the appellant's newspaper was still in his door. When Mr. Thrower left for breakfast the next morning at 4:35 a.m., he again noticed the newspaper undisturbed in the appellant's hotel room door. However, when he returned from breakfast at 6:00 a.m., July 30, 1976, the newspaper was gone from the appellant's door.

The appellant objected at trial to the introduction of these photographs and on appeal alleges that the proper predicate was not laid before the photographs were admitted into evidence. Mr. Thrower testified that the photographs correctly represented what he had seen. This is a sufficient foundation for the admission of photographs into evidence. *White v. State,* 607 P.2d 713 (Okl.Cr.1980).

These photographs merely illustrated Mr. Thrower's testimony, and added no more to the State's evidence than to simply depict a sight the witness had amply described. Although the photographs were cumulative to the testimony, we cannot see how the appellant was prejudiced by them. Cf. *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980), (wherein a videotape having minimal evidentiary value was not highly prejudicial, and was if anything, a waste of the jury's time to view).

## XXII.

■ The appellant alleges the trial court allowed the State to pursue an improper line of questioning during cross-examination of defense witnesses. The appellant in his brief, however, fails to bring to our attention the line of questions he pursued during direct examination of these witnesses. A review of his direct examination readily reveals that the defense invited the cross-examination now complained of.

We have repeatedly held that complaints concerning cross-examination will not be heard if the subject is addressed or opened on direct examination. *Hill v. State,* 589 P.2d 1073 (Okl.Cr.1979). Additionally, the transcript shows that many of the questions counsel alleges as improper on appeal, were either not objected to at trial, or were withdrawn or had had objections lodged against them which were sustained. We find this assignment of error to be without merit.

## XXIII.

■ The appellant assigns as his thirty-fifth proposition that error occurred when the trial court overruled his motion to close the preliminary hearing. In support of his motion he alleged that prejudicial pretrial publicity would result if the press and public were allowed to attend.

On appeal, we must look to whether the appellant is able to show prejudice by the failure to close his preliminary hearing; as one must not only show error on appeal, but also prejudice. *McDonald v. State,* 497 P.2d 1102 (Okl.Cr.1972); *Weimar v. State,* 556 P.2d 1020 (Okl.Cr.1976); 20 O.S.1981, § 3001.1.

Our finding that the jury empaneled was fair and impartial is dispositive here and reflects the absence of prejudicial pretrial publicity. There being no prejudice resulting from the press coverage of the preliminary hearing or any other proceedings, we hold that this assignment of error has no merit.

### XXIV.

The appellant next contends that the trial court erred in allowing Dr. Lewis to testify about the amount of urine that kidneys produce, the amount of urine found in the victim's kidneys during the autopsy, and the approximate time lapse between the victim's last urination and death. This testimony in and of itself cannot be said to have been improperly admitted into evidence. Its relevancy was not outweighed by prejudice at the time it was admitted into evidence as it was simply objective factual testimony, with no apparent prejudicial effect.

The appellant, however, maintains that the prejudicial effect of this testimony occurred during the prosecutor's closing argument. He bases this contention on the allegation that the prosecutor's argument concerning Dr. Lewis' testimony was too speculative. We, however, do not have to reach this issue. We have previously held in this opinion that it was error to admit into evidence the hair specimen alleged to have come from the appellant. The prosecution used Dr. Lewis' testimony during closing argument to establish a theory on how this specimen allegedly got on the victim's undershorts. As we found it to have been error to admit into evidence the hair specimen, it is obvious that error must also be found on appeal where comments were made concerning the inadmissible hair specimen.

### XXV.

After having carefully examined the records submitted on appeal and the voluminous briefs in support thereof, we conclude that the State has shown sufficient evidence to sustain the conviction for First Degree Murder. Even excluding all the evidence improperly admitted, there was legally sufficient evidence for the jury to believe the appellant committed the crime. The evidence was fairly shown, with exceptions as noted. We are of the opinion, however, that due to the circumstantial nature of the evidence and the errors which occurred at trial, i.e., see propositions II(D), IX, X, XIX, XX(B) and XXIV, the sentence should be modified to life imprisonment.

Insofar as the sentence is being modified, those assignments of error challenging the death penalty and the voir dire of the jury for the death penalty have not been discussed.

The appellant's conviction for First Degree Murder in Garfield County Case No. CRF–76–1084, is AFFIRMED, but the sentence imposed is MODIFIED from Death to Life Imprisonment.

BUSSEY, P.J., concurs in results.