2006 OK CR 8

**Michael Allen BROWNING, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2003–363.

Court of Criminal Appeals of Oklahoma.

April 24, 2006.

Robert J. Stubblefield, Tulsa, OK, Attorney for Defendant at trial.

Doug E. Drummond, Steve Kunzweiler, Assistant District Attorneys, Tulsa, OK, Attorneys for the State at trial.

William H. Luker, Jamie D. Pybas, Division Chief, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## *OPINION*

CHAPEL, Presiding Judge.

¶1 Michael Allen Browning was tried by jury and convicted of Counts I and II, Murder in the First Degree in violation of 21 O.S.2001, § 701.7; Count III, Shooting with Intent to Kill in violation of 21 O.S.2001, § 652(A); Count IV, Arson in the First Degree in violation of 21 O.S.2001, § 1401; and Count V Robbery with Firearms in violation of 21 O.S.2001, § 801, in the District Court of Tulsa County, Case No. CF–01–1098. In accordance with the jury's recommendation the Honorable Rebecca Brett Nightingale sentenced Browning to two sentences of death on Counts I and II; life imprisonment (Count III); thirty-five (35) years imprisonment and a $25,000 fine (Count IV); and life imprisonment (Count V). In Counts I and II the jury found the murders posed a great risk of death to another person and were especially, heinous, atrocious and cruel. Browning appeals from these convictions and sentences and raises fourteen propositions of error in support of his appeal.

¶2 Browning met Cenessa Tackett in 1995 (when she was sixteen years old and he was twenty-one) and the two were romantically involved for about four years. Cenessa had learning disabilities and graduated from high school when she was twenty, continuing to live with her adoptive parents, Harry and Teresa Hye. Browning lived with Cenessa, Harry and Teresa for about a year. The two broke up, but continued to see one another in 2000. In August, 2000, Browning visited Cenessa at home; they had intercourse and she became pregnant. Browning was living with another woman at the time. In January, 2001, Cenessa told Browning she was pregnant with his child and wanted child support. Browning admitted it could be his child but refused to pay support. Browning did agree to take a paternity test after the child's birth. Teresa heard part of this conversation. Later in January or early February, Teresa contacted Browning's parents about the baby.

¶3 Shortly before 3:00 a.m. on February 18, 2001, Browning knocked on the Hyes' door. Cenessa, who was up watching television, answered. Browning asked her to come to a breezeway door the family often used. When she did, he and Shane Pethel came in. Cenessa did not know Pethel, but Teresa had met him. After some small talk Teresa and Pethel went outside to smoke a cigarette, leaving Browning alone with Cenessa. Teresa came in, followed by Pethel, who was carrying a pistol. Browning and Pethel ordered the women to sit on the couch. Pethel kept the gun pointed at them while Browning taped their mouths, wrists, and ankles (atop their pants) with duct tape. Browning told Cenessa that she should have kept her legs closed, and told Teresa she should not have called his parents. He also told both women that he didn't want to do

this, but he had to. Browning and Pethel fetched Harry from his bedroom, ordered him to sit beside the women, and taped his mouth, wrists, and ankles. While the taped victims watched, Browning and Pethel carried valuables from the Hyes' bedroom outside. At one point Harry tried to move but Teresa, whose tape gag was loosened by tears, told him to stop because Browning had said he wouldn't hurt them. After several trips outside, Browning and Pethel carried all three victims into the Hyes' walk-in closet, which smelled of lighter fluid. Browning tried without success to set the carpet next to Harry on fire. Browning then lit the clothing hanging above Harry, which began to burn. Pethel asked Browning whether he should shoot Cenessa in the stomach, and Browning told Pethel to do what he had to do. At some point during the shooting Browning left the house. Pethel said "It's time", then shot Harry in the head. As Teresa screamed and tried to reach Harry, Pethel told her, "Shut the fuck up", and shot her twice. When Teresa fell, Cenessa fell over as if she had been hit. Pethel finally shot Cenessa and left the burning closet. Cenessa's neck was grazed and she had a through-and-through wound to her neck very near the carotid artery. She wriggled free from her taped sweat pants, leaving them by the closet door, ran for a phone, and ran outside. As she called 911, the phone died and she threw it by the breezeway door. She went back in, found a cell phone, and made a second emergency call. At some point she got a set of keys, hoping to drive Harry's truck for help, but had the wrong keys and dropped them by the truck. Cenessa returned again to the burning house, got a blanket and wet it at an outside hydrant, and went back in to find her parents. Harry had crawled to the closet door. She pulled him as far as the dining room before, overcome with smoke, she had to leave the house.

¶ 4 Law enforcement and emergency personnel arrived and rescued Harry, who was shot and suffering second- and third-degree burns. He was conscious briefly at the scene and complained of pain. Officers could not return to the house for Teresa, and her body was recovered from the closet later that day. She had one gunshot wound to the neck and one to the chest, both potentially fatal, and no soot was present in her airway. The medical examiner concluded that Teresa died of gunshot wounds. Harry was hospitalized, underwent surgery for his head wound and skin grafts for his burns, and died on March 12. Cenessa was hospitalized briefly. At the scene and afterwards, she consistently told law enforcement and emergency personnel that Browning had done this, and she testified against Browning at trial. Cenessa had a baby boy on April 13, 2001. Browning never took a paternity test.

## Pretrial Issues

¶ 5 In Proposition VI Browning claims that the trial court erred in admitting into evidence photographs of duct tape and cigarette lighter fluid found at his residence. He argues that the facts alleged in the affidavit supporting the search of the house did not set forth probable cause to show that these items were at that location. At trial, Browning objected and asked that this evidence be suppressed based on lack of probable cause for search in the affidavit. While this is imprecise, it arguably preserves this claim of error. The standard of review for this claim is whether, under the totality of the circumstances, a magistrate can make a "practical, common sense decision" there is a fair probability that evidence or contraband will be found at a particular place.[1] Upon review, we ensure that the magistrate had a substantial basis for finding probable cause.[2] An affidavit in support of a search warrant must include a particular description of the place, person or things to be searched.[3] We will

1. *Young v. State,* 1998 OK CR 62, 992 P.2d 332, 339, *cert. denied,* 528 U.S. 837, 120 S.Ct. 100, 145 L.Ed.2d 84 (1999); *Lynch v. State,* 1995 OK CR 65, 909 P.2d 800, 804–05; *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

2. *Lynch,* 909 P.2d at 804–05.

3. *Bryan v. State,* 1997 OK CR 15, 935 P.2d 338, 353, *cert. denied,* 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299.

defer to the magistrate's determination of probable cause based on the affidavit.[4]

 ¶ 6 Browning complains that the affidavit in support of the warrant neither connected him with the crime, or gives any reason to believe that proceeds from the crime would be at his residence. The affidavit lists, and the search warrant authorizes a search for, guns, the clothing Cenessa said Browning wore, and duct tape, as well as specific items taken from the Hye house. Those items include jewelry, currency, video cameras and guns. The affidavit recounts Cenessa's story and says a neighbor saw Pethel and Browning at the house in Pethel's truck shortly before the crimes. The affidavit further states that the affiant trying to contact Browning looked through his front window and saw a video camera, tripod and guns similar to those stolen. Browning admits this Court has often held that a natural place to look for evidence of a crime is the residence of the person accused of the crime.[5] Browning suggests this rule should not apply here, as there were two perpetrators and, thus, two potential residences to be searched. Understandably, Browning cites no cases for his argument that, where there are two suspects, law enforcement cannot act on the logical assumption that either residence might have been used to conceal contraband.[6] The affidavit in this case refers exclusively to Browning's home. After listing details of the crimes and Browning's participation in it, the affiant states that, the day after the crimes, he saw items which appeared to be stolen from the Hye residence through Browning's window. This information constitutes a substantial basis for the magistrate's finding of probable cause. This proposition is denied.

## Issues Relating to Jury Selection

¶ 7 In Proposition I Browning claims that the trial court abused its discretion in failing to either grant a mistrial or remove for cause a juror who was inappropriately contacted by a member of Teresa Hye's family. On the fourth day of voir dire, Juror Ridgeway joined the jury panel. Proceedings resumed after a day's break, during which time Ridgeway went to work. When asked about jury duty, she replied that it was a murder trial and she couldn't talk about it. Later that afternoon she received an internal phone call from someone who apparently worked in the same building and was on the company phone system. The hysterical caller identified herself as Pat Tackett. Ridgeway did not know Tackett. Tackett told Ridgeway she had to get dismissed because "that was my sister" and she could cause a mistrial since they worked in the same place. Ridgeway did not understand how Tackett's sister was involved in the case, but described the encounter at the beginning of court the next day. The court held two *in camera* discussions with Ridgeway and the parties about this incident. Ridgeway consistently said that the call did not affect her ability to be fair and impartial. The ·call did upset her because she didn't like someone she didn't even know telling her what to do, but that would not affect her ability to sit on the jury. She initially stated continued jury service might put her in a bad situation at work. However, she later said she did not believe it

4. *Mollett v. State,* 1997 OK CR 28, 939 P.2d 1, 7, cert. denied, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998); *Bryan,* 935 P.2d at 353.

5. *Mollett,* 939 P.2d at 7; *Fritz v. State,* 1986 OK CR 181, 730 P.2d 530, 532; *Bollinger v. State,* 1976 OK CR 269, 556 P.2d 1035, 1039.

6. Browning's cited cases turn on different factual situations and, even by analogy, do not assist the Court. In *Sanders v. State,* 1980 OK CR 14, 610 P.2d 247, 250, the trial court erroneously issued a search warrant for the defendant's business and his home, even though the affidavit stated the contraband could be found at defendant's business. In *United States v. Rowland,* 145 F.3d 1194, 1205–1206 (10th Cir.1998), federal officers got an anticipatory warrant for defendant's residence. The court ruled there was no probable cause to search the residence, where the affidavit indicated the contraband would be delivered to defendant's post office box and he would probably pick it up and go to work before returning home. This Court ruled the warrant issued in error in *McCann v. State,* 1972 OK CR 343, 504 P.2d 432, 436, where the affidavit indicated no actual criminal activity and thus did not connect the defendant with a crime. Browning's other cited cases all involve situations where either the affidavit did not name the place which was searched, or did not include personal observations of criminal activity.

would affect her job at all; she had already reported the conversation to her supervisor, who told her to tell the judge. The trial court denied Browning's request that Ridgeway be excused for cause, and denied his motion for a mistrial, noting that in her opinion any prejudice in the incident went against the State rather than Browning.

¶ 8 Browning claims that the trial court's refusal to excuse Ridgeway for cause was error. He argues this violates both the statute making it a crime to attempt to influence a juror,[7] and the statute prohibiting conversation with a juror on any subject related to the trial.[8] The State correctly argues that Browning waived this claim when he failed to preserve it by excusing Ridgeway with a peremptory challenge and making a record of which remaining juror he would have excused had he not used that peremptory challenge on Ridgeway. We have long held that, in order to preserve an objection to a denial for challenge for cause in voir dire, a defendant "must demonstrate that he was forced, over objection, to keep an unacceptable juror." [9]

¶ 9 Browning suggests this Court should abandon this precedent in light of the United States Supreme Court's ruling in *United States v. Martinez–Salazar*.[10] As the State notes, *Martinez–Salazar* turns on the application of a specific Federal rule of criminal procedure which, unlike Oklahoma law, does not require a defendant to use a peremptory challenge to cure an erroneous denial of a challenge for cause. There, Martinez–Salazar chose to exercise a peremptory challenge after his challenge for cause was denied, then claimed his right to exercise peremptory challenges under the rule was impaired by the trial court's ruling. The Court declined to adopt the rule in *Ross v. Oklahoma*, which upheld Oklahoma's law described above, in federal cases. However, the Court noted that *Ross* held there was no error where a defendant received everything allowed by state law and got a fair trial by constitutional due process standards, since there was no proof that any incompetent juror sat on Ross's jury.[11] Discussing a defendant's dilemma in choosing between using a peremptory challenge or keeping a juror he believed to be unacceptable, the Court stated, "A hard choice is not the same as no choice." [12] The Court held that, following *Ross*, where a defendant is accorded the number of peremptory challenges allowed under the applicable federal law, he cannot claim his constitutional right to due process was violated.[13] While *Martinez–Salazar* is the law in cases involving federal criminal procedure, it is not—as Browning argues—law which requires any change of course from this Court. Browning failed to preserve this claim and has waived all but plain error.

¶ 10 Browning specifically argues that Ridgeway should have been excused because she was tainted by Tackett's improper communication and attempt to influence her. The issue is whether the trial court abused its discretion in finding that Ridgeway's ability to perform her functions as a juror was not affected by the improper communication.[14] Browning admits that, to prevail on this claim, he must show he was prejudiced by the communication.[15] He argues that the

7. 21 O.S.2001, § 388.

8. 12 O.S.2001, § 581.

9. *Warner v. State*, 2001 OK CR 11, 29 P.3d 569, 573–74; *see, e.g., Matthews v. State*, 2002 OK CR 16, 45 P.3d 907, 915, *cert. denied*, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570; *Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 49; *Young*, 992 P.2d at 338; *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158; *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988).

10. 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).

11. *Id.*, 528 U.S. at 313, 120 S.Ct. at 780.

12. *Id.*, 528 U.S. at 315, 120 S.Ct. at 781.

13. *Id.*, 528 U.S. at 317, 120 S.Ct. at 782.

14. *Warner*, 29 P.3d at 572; *Nickell v. State*, 1994 OK CR 73, 885 P.2d 670, 676. Contrary to the State's suggestion, *Nickell* does not hold that there is no abuse of discretion unless it is shown that a reason to excuse for cause is present when the ruling is made. In *Nickell*, no voir dire transcript was submitted on appeal; there was an insufficient record to establish either juror bias or abuse of discretion.

15. *Matthews*, 45 P.3d at 913 (where juror converses with third parties during the trial and prior to deliberations, defendant must show prej-

communication itself, because it was on a subject connected with the trial (Ridgeway's ability to sit as a juror), was prejudicial even though it did not involve facts of the case or Browning's guilt or innocence. This is not the standard. Browning must show that an *improper communication on a subject connected* with the case affected Ridgeway's ability to be fair and impartial.[16] This he cannot do. Ridgeway consistently said she could remain fair and impartial despite the improper communication. The trial court did not abuse its discretion in refusing to excuse Ridgeway for cause, or in denying Browning's motion for a mistrial. There is no plain error, and this proposition is denied.

 ¶ 11 Browning claims in Proposition II that he was unfairly forced to use peremptory challenges on Jurors Ritter and Allen after the trial court denied his challenges for cause to those jurors, compelling him to accept another, unacceptable, juror. Browning used his first peremptory challenge on Ritter and his eighth on Allen. However, Browning failed to preserve this issue by making a record of which remaining jurors he would have excused had he not used those peremptory challenges.[17] Browning suggests counsel "inartfully" preserved the error because the record shows Juror Ridgeway, who also survived a challenge for cause, remained on the panel (see Proposition I). This expands the definition of "inartful" to include "counsel completely failed". We review only for plain error. There is none. The decision whether to excuse a juror for cause is within the trial court's

discretion.[18] Browning fails to show the trial court abused its discretion in refusing to excuse either juror, and this proposition is denied.

 ¶ 12 Browning first complains the trial court erred in denying his request to excuse Juror Ritter for cause, because Ritter was biased against him. "Actual bias is present when a juror's views prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath."[19] Ritter was among the first twelve jurors called to the jury box. She explained that her sister's husband had murdered her sister twenty years earlier, and she was afraid this would affect her ability to be fair and impartial. During an extended *in camera* colloquy, Ritter explained she was still upset because the husband was out of prison after serving four years of a 45-year sentence and she thought his family influenced his release. As she considered the matter, Ritter decided that if she thought of the defendant as her own child, she could have compassion for him and separate the facts of this case from those of her sister's. From that point, Ritter consistently said she could be fair and impartial to both sides, during repeated questioning by both parties and the trial court. The trial court found that, although Ritter was hesitant at first, she appeared certain and positive that she could be impartial. The record does not support Browning's claim that anyone "telegraphed" to Ritter a message that she should recant her initial statement. Ritter's re-

---

udice); *Pennington v. State*, 1995 OK CR 79, 913 P.2d 1356, 1363, *cert. denied*, 519 U.S. 841, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996); *Wacoche v. State*, 1982 OK CR 55, 644 P.2d 568, 572.

16. *Matthews*, 45 P.3d at 913; *Al–Mosawi v. State*, 1996 OK CR 59, 929 P.2d 270, 280, *cert. denied*, 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997); *Tibbetts v. State*, 1985 OK CR 43, 698 P.2d 942, 947; *Thomas v. State*, 1977 OK CR 63, 560 P.2d 1011, 1013; *Townley v. State*, 1959 OK CR 100, 355 P.2d 420, 431. Browning relies on *Pulliam v. State*, 1971 OK CR 497, 491 P.2d 353 (1971). That was not an improper communication case. In *Pulliam*, the Court reversed where jurors were aware, during deliberations, that the defendant's father was charged with attempting to bribe a police officer in the case. The Court did not reach the issue of bias or prejudice, but

held that reversal was compelled by the statute prohibiting jurors from receiving any evidence other than that admitted in court. *Id.* At 354–355. That is not the case here. Browning also relies on *United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir.1980). That opinion clearly finds that an improper communication between jurors and a federal marshal, though not related to the facts of the case, cast doubt on the impartiality of the verdict and actually prejudiced the defendant.

17. *Warner*, 29 P.3d at 573–74.

18. *Hanson*, 72 P.3d at 48; *Warner*, 29 P.3d at 572.

19. *Warner*, 29 P.3d at 572; *Young*, 992 P.2d at 337.

sponses indicate that her personal experience did not preclude her ability to be fair and impartial, and the record supports the trial court's decision to respect and believe Ritter's answers.[20] The trial court did not abuse its discretion in refusing to excuse Ritter for cause.

 ¶ 13 Browning next complains that the trial court erred in denying his request to excuse Juror Allen for cause.[21] Allen told the court she had no peripheral vision and had lost a significant amount of her forward vision, but could see close up and would be able to see from the front of the jury box. The trial court noted that Allen was not completely blind and wore glasses, and that the court could accommodate her vision problems with seating, and denied Browning's challenge for cause. The next day defense counsel complained that Allen appeared to be asleep and asked again that she be removed for cause. The trial court stated that she saw Allen's eyes closed and had been watching Allen carefully. The court said that when the whole panel was asked a question, Allen responded appropriately. The court concluded that Allen was resting her eyes but paying attention, and again denied the motion to excuse Allen for cause. While it is certainly error to allow a sleeping juror to remain on the panel through deliberations,

the record does not support Browning's claim that Allen was sleeping. While physical infirmities may be grounds for a challenge for cause,[22] the record does not support Browning's argument that Allen's infirmities prevented her from carrying out her duties as a juror. The trial court, which was in the best position to observe Allen, did not abuse its discretion in refusing to remove Allen for cause.

## Issues Relating to the First Stage of Trial

 ¶ 14 Browning argues in Proposition III that trial counsel was ineffective for failing to thoroughly cross-examine and impeach Cenessa with available evidence showing she was not truthful regarding her contact with co-defendant Pethel before the crimes. To prevail on this claim Browning must show counsel's performance was so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and that the deficient performance created errors so serious as to deprive Browning of a fair trial with reliable results.[23] Counsel's performance is measured against an objective standard of reasonableness under prevailing professional norms.[24] There must be a reasonable probability that, without counsel's

---

20. As Browning notes, this Court has occasionally held that a juror's insistence that she can be fair and impartial may not end the analysis. *Plantz v. State*, 1994 OK CR 33, 876 P.2d 268, 278, *cert. denied*, 513 U.S. 1163, 115 S.Ct. 1130, 130 L.Ed.2d 1091 (1995); *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158; *Tibbetts v. State*, 1985 OK CR 43, 698 P.2d 942, 946. In *Plantz* the record belied the juror's statement that she could be fair; in *Hawkins* (a driving under the influence case), not only had a family member been killed by a drunk driver, but the juror was married to the county sheriff whose office handled the arrest. In *Tibbetts* (a rape case), the Court found a juror could not be impartial despite her assurances otherwise where her son-in-law was a deputy sheriff and had applied for a job with the county district attorney, and her daughter had recently been the victim of a sex crime. These unusual circumstances are not present here.

21. In her juror questionnaire, Allen said she didn't like defense attorneys and thought they were probably crooked. During voir dire she admitted this was a little harsh. Defense counsel did not include this comment in his motions to

have Allen excused for cause. Appellate counsel mentions it but does not suggest that the comment itself warranted a challenge for cause.

22. In *Hammon v. State*, 2000 OK CR 7, 999 P.2d 1082, 1095, *cert. denied*, 531 U.S. 1090, 121 S.Ct. 812, 148 L.Ed.2d 697 (2001), the trial court did not err in excusing hard-of-hearing jurors at their request. In *Castro v. State*, 1992 OK CR 80, 844 P.2d 159, 168, *cert. denied*, 510 U.S. 844, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993) the trial court excused an alcoholic juror based on defense counsel's observations of the juror in a separate case.

23. *Hooks v. State*, 2001 OK CR 1, 19 P.3d 294, 317, *cert. denied*, 534 U.S. 963, 122 S.Ct. 371, 151 L.Ed.2d 282; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674, 693 (1984).

24. *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005); *Wiggins*, 539 U.S. at 521, 123 S.Ct. at 2527.

errors, jurors would have concluded that the balance of aggravating and mitigating circumstances did not support a death sentence.[25] "A reasonable probability is one sufficient to undermine confidence in the outcome."[26] In reviewing a claim of ineffective assistance we give great deference to trial counsel's strategic decisions.[27] We consider counsel's choices made from counsel's perspective at the time.[28] Browning must present evidence overcoming this Court's presumption that counsel's conduct was professional and could be considered sound strategy.[29] If we determine that the defendant was not prejudiced by counsel's actions or omissions, we will not find counsel ineffective.[30]

¶ 15 Browning consistently denied participating in these crimes. The defense trial strategy was to claim that Cenessa and Pethel planned and committed the crimes together, then Cenessa blamed Browning because she was angry at him. Defense counsel argued this theory vigorously. He also cross-examined Cenessa and other witnesses looking for testimony that would support this position. Key to the theory, of course, was proving that Cenessa knew Pethel before the crimes. Consistent with her statements to

rescuers the night of the crimes, Cenessa testified that she did not know Pethel. Leaving this defense theory aside, as an eyewitness Cenessa was the State's most important witness, and counsel worked hard to cast doubt on her credibility. In two subpropositions Browning argues that counsel failed to (a) use prior inconsistent statements to thoroughly cross-examine and impeach Cenessa with evidence that she knew Pethel, and (b) failed to use available evidence or investigate easily discoverable material which would have aided him in impeaching Cenessa. Neither claim meets the test above.

¶ 16 First, Browning argues counsel should have used Cenessa's pretrial statements to impeach her testimony that she had not met Pethel before the crimes.[31] Browning cites several cases in which counsel was found ineffective for failing to cross-examine a crucial witness. In each case, the witness made a statement which differed significantly from or completely contradicted his trial testimony.[32] The inconsistencies in Cenessa's pretrial statements do not rise to this level. After her very first contacts with police, Cenessa made clear that two persons were involved in the crime. She knew Browning well, and their previous relationship, coupled

**25.** *Hooks*, 19 P.3d at 317; *Ullery v. State*, 1999 OK CR 36, 988 P.2d 332, 351.

**26.** *Williams v. Taylor*, 529 U.S. 362, 394, 120 S.Ct. 1495, 1513–1514, 146 L.Ed.2d 389 (2000).

**27.** *Hooks*, 19 P.3d at 317.

**28.** *Rompilla*, 125 S.Ct. at 2462; *Wiggins*, 539 U.S. at 523, 123 S.Ct. at 2536; *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2052; *Hooks*, 19 P.3d at 317.

**29.** *Ryder v. State*, 2004 OK CR 2, 83 P.3d 856, 874–75, *cert. denied*, 543 U.S. 886, 125 S.Ct. 215, 160 L.Ed.2d 146; *Patterson v. State*, 2002 OK CR 18, 45 P.3d 925, 929; *Banks v. State*, 2002 OK CR 9, 43 P.3d 390, 402, *cert. denied*, 537 U.S. 1126, 123 S.Ct. 898, 154 L.Ed.2d 811 (2003); *Hooks*, 19 P.3d at 317.

**30.** *Williams*, 529 U.S. at 393, 120 S.Ct. at 1513 (defendant prejudiced where counsel's actions deny him a substantive or procedural right to which he is entitled by law); *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2052; *Hooks*, 19 P.3d at 317; *Alverson v. State*, 1999 OK CR 21, 983 P.2d 498, 510, *cert. denied*, 528 U.S. 1089, 120 S.Ct. 820, 145 L.Ed.2d 690 (2000).

**31.** Counsel did use pretrial statements in an attempt to impeach Cenessa's story. For example, counsel referred to her statement to police at the hospital regarding her clothing to suggest that she was lying when she testified she was wearing a flannel shirt at the time of the crime. This particular attempt at impeachment was hampered by the fact that photographs taken at the hospital show the shirt beneath Cenessa on a hospital gurney.

**32.** *Patterson*, 45 P.3d at 929; *Driscoll v. Delo*, 71 F.3d 701, 709–711 (8th Cir.1995); *Moffett v. Kolb*, 930 F.2d 1156, 1159–62 (7th Cir.1991); *Nixon v. Newsome*, 888 F.2d 112, 115–16 (11th Cir.1989); *Smith v. Wainwright*, 741 F.2d 1248, 1252–53 (11th Cir.1984); *Brown v. State*, 110 Nev. 846, 877 P.2d 1071, 1072–73 (1994); *Thomas v. State*, 308 S.C. 123, 417 S.E.2d 531, 532 (S.Car.1992); *Clay v. State*, 954 S.W.2d 344, 347–50 (Mo.Ct.App.1997); *People v. Salgado*, 263 Ill.App.3d 238, 200 Ill.Dec. 784, 635 N.E.2d 1367, 1373–75 (1994); *Ellyson v. State*, 603 N.E.2d 1369, 1374 (Ind.Ct.App.1992); *Wright v. State*, 581 N.E.2d 978, 980 (Ind.Ct.App.1991).

with his comments about her pregnancy during the crime, may explain why she consistently identified him as present and initially said he had shot her or had done this to her. Cenessa also consistently stated that she did not know the second perpetrator but that Browning had introduced him as Shane. Cenessa picked Pethel and Browning from a photo lineup at the hospital.

¶ 17 Browning argues that counsel should have attacked Cenessa with several minor discrepancies which, he claims, show she was lying when she denied knowing Pethel. Browning emphasizes one portion of a 911 call in which Cenessa says that Browning and Pethel committed the crime but "it wasn't Shane because I know Shane." Browning suggests this means that, despite her repeated denials, Cenessa actually knew Pethel. Another equally plausible interpretation is that Cenessa knew someone else named Shane and knew that person was not involved in the crimes. One could also infer from the entire record that, during that 911 call, Cenessa was extremely upset and not sure what she was saying. Several times Cenessa testified she did not remember the specific circumstances surrounding the 911 calls, other than that she made them and tried to get help. During a motions hearing well after the crimes, Cenessa testified she was afraid Browning would send someone after her "like Shane did. I didn't think that Shane would do something like that." Cenessa stated more than once that, although she did not know Pethel, Teresa had met him when Browning brought him to the family pond to fish. He suggests counsel should have asked how Teresa could know Pethel if Cenessa did not. One of Cenessa's previous statements explains that Browning and Pethel came to the property to fish, and met Teresa, before the house had been built and while Cenessa was not there. Had counsel asked the question, if Cenessa did not give that response the State certainly could have used the statement to provide that answer.

¶ 18 Over the course of two days, Cenessa spent several hours on the stand. Even from a transcript, her immaturity and learning difficulties are evident. Her limitations must have been even more apparent to a jury. She was not in any way a reluctant witness. However, she did not provide narrative and gave only short, often fragmented answers to all parties' questions. The expansiveness of her answers depended directly on the specificity of counsels' questions. Her essentially childlike outlook was shown when she admitted she had lied to investigators, claiming that Browning deliberately killed her pets in front of her before the shootings, because she thought that would get him in even more trouble than he was in for the robbery and murder of her parents, and the attack on her. The prosecution very effectively demonstrated that Cenessa's estimates of time were significantly longer than actual time elapsed, and her estimates of measurement were similarly inaccurate. Often, Cenessa could not remember details of her movements during or statements immediately after the crimes. While her more specific prior statements may have provided details missing from her testimony, these details did not significantly change her claim about who committed the crimes, or her insistence that she had not met Pethel.

¶ 19 Browning particularly relies on *Glossip v. State*.[33] The cases are not analogous. In *Glossip*, the murderer, Sneed, accepted a deal for life without parole in return for testimony that Glossip had manipulated him into committing the crime. No other evidence connected Glossip to the murder. Sneed's account of the crime in his videotaped interview with police differed significantly and materially from his trial testimony. However, counsel failed to impeach Sneed with the statements on the tape; counsel failed to lay sufficient foundation to introduce the tape through a police officer, and did not try to introduce it to impeach Sneed. There was no reasonable trial strategy for failing to impeach the witness with this evidence.[34] Trial counsel had no coherent theory of defense and had not researched either facts or law surrounding his proposed

---

**33.** 2001 OK CR 21, 29 P.3d 597.

**34.** *Id.* at 601.

theory.[35] Counsel failed to object to damaging double hearsay, failed to ask for adequate instructions which would have allowed jurors to consider Glossip's claim that, at most, he was an accessory after the fact, and failed to object to improper and inadmissible victim impact evidence.[36] The record reflected counsel was generally unprepared for trial; counsel advised Glossip to plead guilty, appeared unfamiliar with the materials he received in discovery, failed to secure witnesses, failed to call anyone but Glossip's mother in the second stage, and appeared unprepared for the second stage proceedings.[37] Given these egregious deficiencies which could not have been strategic, and considering the strength of the evidence against Glossip, counsel's deficient performance required reversal. By contrast, Browning's counsel was prepared for both first and second stages of trial, vigorously advanced a defense theory and supported it both by cross-examination and calling witnesses, and appropriately objected to both testimony and evidence he felt would harm his client. Counsel diligently and zealously attacked Cenessa's credibility. We cannot find counsel ineffective for failing to use available evidence to impeach Cenessa, and this subproposition is denied.

¶ 20 In his second subproposition Browning claims counsel failed to use statements he received in discovery, and failed to investigate easily available witnesses. We will not hold counsel ineffective for failing to investigate every possible avenue of defense; counsel may make strategic choices based on less than complete investigation, which will be considered reasonable to the extent that reasonable professional judgment supports the limitations on investigation.[38] A defense attorney has a duty to do reasonable investigation into evidence which may impeach key witnesses.[39] However, after reviewing available material, a defense attorney may, as a matter of sound strategy, decide not to use it for impeachment.[40] The effect of any additional material counsel could have used at trial must be evaluated in the context of the entire record.[41]

¶ 21 In conjunction with the claims in this subproposition, Browning has filed a Rule 3.11 motion for an evidentiary hearing on the issue of ineffective assistance of counsel.[42] To warrant an evidentiary hearing, Browning must present this Court with clear and convincing evidence of a strong possibility that counsel was ineffective for failing to identify or use the evidence raised in the motion.[43] Browning's submitted material does not meet this standard.

¶ 22 Insofar as Browning argues counsel failed to sufficiently use existing and available evidence, his claim fails. As we discuss above, Cenessa's previous statements do not significantly contradict her trial testimony. While counsel certainly could have attacked Cenessa's credibility with some discrepancies, the decision not to use the statements was a reasonable trial strategy.[44] In addition to the minor factual differences, many of these statements contain more information than Cenessa provided at trial, all of which would have damaged Browning's case.[45] Each statement also contained many

35. *Id.* at 602.

36. *Id* at 602–03.

37. *Id.* at 603.

38. *Wiggins*, 539 U.S. at 528, 123 S.Ct. at 2539; *Strickland*, 466 U.S., at 690–691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

39. *Patterson*, 45 P.3d at 930.

40. *Matthews* 45 P.3d at 918–19.

41. *Patterson*, 45 P.3d at 930.

42. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2005).

43. *Id.*

44. *Matthews*, 45 P.3d at 918–19.

45. For example, she describes how Harry, trying to escape from the burning house, was bleeding from the mouth, in severe pain, and called out for Teresa—supporting the State's allegation that Harry's death was especially, heinous, atrocious or cruel. On cross-examination, counsel inferred that the father of Cenessa's baby could have been her boyfriend Dave. In one statement she explains that Dave could not have children and tests showed he was not her baby's father. Counsel suggested that Cenessa called Harry by his first name because they did not get along (implying a motive for murder); Cenessa states

details consistent with Cenessa's trial testimony. Affidavits by family members regarding statements Cenessa made immediately after the crimes are consistent with her initial focus on Browning in statements to police. Browning argues that counsel should have used State witness Vaughan's previous statements to former counsel and Browning's sister (newly discovered) and police (provided in discovery) to contradict Cenessa's testimony regarding the time of the crime. At trial, counsel asked Vaughan whether she remembered previously saying that Browning and Pethel reached her house at about 3:30 a.m., rather than 4:20 a.m, as she testified. Vaughan replied that she did not remember telling anyone the earlier time but, if she had, she had been mistaken. Presenting witnesses or using previous statements regarding the earlier time would not resolve this debate. As counsel's actions are supported by sound strategy, counsel was not ineffective, and Browning fails to meet the Rule 3.11 threshold requirements for an evidentiary hearing on the issue.

¶ 23 Browning claims counsel could have done more investigation to impeach Cenessa's testimony. Cenessa testified she had never met Pethel and did not remember seeing him at softball games but, after watching him shoot her parents, she would never forget his face. Browning submits several affidavits from persons associated with his softball team. Taken as a whole, these show that Browning and Pethel played on the same softball team for several years and Cenessa attended their games. Several of the affidavits use this observation to assume that Cenessa and Pethel must have known one another. Only one affidavit has Cenessa and Pethel talking together. While one person stated Pethel talked about what an unfortunate effect Cenessa had on Browning, that affiant did not say that Pethel knew Cenessa personally. Browning appears to suggest that Pethel's statement to police that he did not know Cenessa, which corroborates her testimony that she did not know him, actually supports Browning's claim that the

she called Harry by his first name because she was in contact with her birth father and called him dad.

two knew one another. Counsel was aware that Cenessa had the opportunity to meet Pethel at softball games and also knew that Cenessa and Pethel denied knowing one another. The strategic decision to limit investigation in this area was professionally reasonable.[46] Browning also provides an affidavit from a man who dated Cenessa after the crimes, but before trial. Based on this affidavit, any testimony this man could offer would be inadmissible hearsay. In addition, we cannot find counsel ineffective for failing to locate and interview a man whom the victim dated for a few months, beginning over a year after the crimes and ending fifteen months before trial. This subproposition is denied.

¶ 24 In Proposition IV Browning claims that the trial court committed reversible error by permitting Cynthia Garrett, the Tackett family attorney, to refuse to divulge the amount of money that Cenessa Tackett stood to inherit from the Hye estate, frustrating Browning's right to present a defense. Browning's defense was that Cenessa committed the crimes. As Browning argues, inheritance would be a motive for murder. To further this claim Browning appears to argue that he wanted to show the jury that Cenessa would actually inherit something. On cross-examination, Cenessa was asked whether she had received any money as a result of the victims' deaths, or had been told she would receive money. She said, "No." She said there was probably a will or trust leaving her money, property or personal possessions. When asked what she anticipated receiving, she responded, "Nothing. I mean, all I know—what do you mean?" When asked again if she anticipated receiving something of value, she said "Yes. It was a little bit [sic] money out of the trust." She said she did not know how much money she would get or when she would receive it, and that Cynthia Garrett was in charge of the trust. Cynthia Garrett was Teresa and Harry Hye's family attorney. After their deaths, she acted as family attorney for Cenessa.

46. *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535; *Matthews,* 45 P.3d at 919.

¶ 25 The day after Cenessa testified, Deputy Shelton testified that one of the safes in the Hye's bedroom contained legal and trust documents. On cross-examination Shelton confirmed that the crime scene property list did not specifically include legal documents. However, he identified them as among papers, still in the custody of the county sheriff, in photographs which were introduced as Defendant's Exhibits 2 and 3. Counsel was thus aware of the documents recovered at the scene and had the opportunity to view them but did not do so. At the close of that business day, counsel prepared a subpoena duces tecum for Garrett, which was served the following day, directing her to come to court on February 5, the next business day, with all her files regarding the Hyes or the Hye trust.

¶ 26 Garrett appeared in court, on the twelfth day of trial, and argued against the subpoena duces tecum. She explained that Teresa and Harry Hye had been her clients since the mid–1990s and she had written their trust document. Garrett was also a trustee for the Hye trust after their deaths. The trust had not been made public in any way, and nothing had been probated from the Hye estate, so no information from the trust was already public knowledge. Garrett unambiguously asserted the attorney-client privilege on behalf of Teresa and Harry Hye for everything concerning the trust. During the course of this hearing defense counsel abandoned all claim to any paperwork named in the subpoena duces tecum. Counsel stated that, if Garrett testified, Browning only wanted to ask her one question—how much money Cenessa would inherit. The prosecutor refused to limit any potential cross-examination, noting that the State would object on relevancy grounds until there was some evidence that Cenessa knew how much money she would inherit. The trial court noted Cenessa had already testified she knew she

would inherit something but had not been told how much, and quashed the subpoena. Browning objected to this ruling and preserved the error for review.

¶ 27 Browning argues the trial court erred in quashing the subpoena. He claims that any valid claim of privilege should have given way to his right to put on his defense.[47] Neither party addresses the threshold issue before this Court: was the information sought from Garrett relevant? Relevant evidence is that which tends to make more or less probable the existence of any fact of consequence to the determination of the action.[48] Browning's defense did not depend on what Cenessa actually stood to inherit. His defense depended on what Cenessa believed or had been told she would inherit—that is, on what Cenessa knew or believed to be true. As the prosecutor noted at trial, there was no evidence that Cenessa had been told she would inherit any specific amount. Cenessa herself testified that she thought she would inherit something, did not know how much, and had not been told how much. Conceivably, it would have been relevant if someone at trial had asked Garrett if she agreed with Cenessa's statement that she had not been told what she would inherit. An answer to this general question would have provided a basis for determining whether the trial court should have ordered Garrett to testify about the trust assets despite the attorney-client privilege. Nobody asked Garrett this question, which leaves this Court with Cenessa's statement that nobody had told her how much she would receive. The only relevant question for Browning's defense was what Cenessa thought she would get if she killed her parents. Garrett's testimony would not have answered that question. The trial court did not abuse its discretion in quashing the subpoena duces tecum. This proposition is denied.[49]

47. Browning inexplicably suggests there is some doubt on whose behalf Garrett asserted the privilege, and gives several reasons why Cenessa had waived any privilege asserted as to her, by partially disclosing what little she did know. The Court does not address these arguments. Garrett specifically asserted the privilege on behalf of the Hyes, not Cenessa.

48. 12 O.S.2001, § 2401.

49. The attorney-client privilege may be invoked by an attorney on a dead client's behalf. 12 O.S.2001, § 2502(C). This Court has held that, where a defendant has other means to defend against the State's accusations and there are no unique circumstances, the constitutional right to present a defense and confront witnesses will not

¶ 28 Browning argues in Proposition V that the trial court erred in refusing to order the disclosure of Cenessa's mental health records. In discovery, Browning requested Cenessa's medical records. Attorney Garrett acted as Cenessa's spokesperson throughout the pretrial period, and relayed messages and information from Cenessa to the prosecutor. The prosecutor, in turn, communicated with defense counsel. Everyone agreed Browning was entitled to the hospital records documenting her admission and treatment for injuries resulting from this crime, and those records were produced. However, several months after these crimes Cenessa underwent a mental health evaluation for treatment in Indiana. In late January, 2002, Garrett inadvertently faxed those records to a district attorney investigator. In March, 2002, Browning moved to compel production of any mental health records. The prosecutor, trying to determine how he got the Indiana material, contacted Garrett. She responded with an April 16, 2002 letter which states in its entirety:

> It has come to my attention that on January 30, 2002, my office mistakenly faxed to your office information concerning Cenessa Tackett's medical treatment to help her deal with the trauma resulting from the murder of Harry and Teresa Hye by Michael Browning and Shane Pethal [sic] and their attempt to murder her. Cenessa *has not* authorized these records to be released to your office and I do not have the authority to release them to anyone. Accordingly, please seal the documents and return them to me immediately.[50]

¶ 29 After a hearing on Browning's motion to compel, the trial court ruled that this letter confirmed Cenessa had not waived the physician-patient privilege attached to her medical records. As there was no waiver of the privilege, the court ruled Browning was not entitled to the documents. Separately, the trial court reviewed the documents under seal and ruled that they contained no exculpatory material to which Browning would be entitled under *Brady v. Maryland*.[51] The trial court sealed the records as an appellate exhibit. Browning claims the trial court's decision regarding waiver was error, and asks this Court to review the exhibit to determine whether it contains any material favorable to him.

¶ 30 The physician-patient privilege as recognized in Oklahoma may be waived only by the patient.[52] Voluntary disclosure of privileged material constitutes waiver.[53] Browning argues that Cenessa waived this privilege when Garrett voluntarily, if mistakenly, provided it to the district attorney's office. He relies on *Hooper v. State*,[54] where we upheld a trial court decision to require a physician to testify against the defendant even though the defendant refused to waive the privilege for the doctor's testimony. Before the State called the doctor, Hooper had provided the State with his report in discovery and admitted the report as mitigating evidence against the death penalty. This Court ruled that, by giving the State the doctor's report and admitting it at trial, Hooper had disclosed a significant part of the privileged material and waived his

warrant breaking the attorney-client privilege. *Gilson v. State*, 2000 OK CR 14, 8 P.3d 883, 910, *cert. denied*, 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001). The United States Supreme Court has also noted that "exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege." *Swidler & Berlin v. United States*, 524 U.S. 399, 409 n. 3, 118 S.Ct. 2081, 2087 n. 3, 141 L.Ed.2d 379 (1998). No exceptional or unique circumstances are present here. In their appellate briefs, both Browning and the State list evidence admitted at the trial which suggest the Hyes were well off, including the vehicles at the scene, testimony about the homestead, and items recovered after the crimes. As Browning admits, evidence of the Hye's possessions alone might have been impressive to Cenessa, and the jury

had the opportunity to see and consider this when evaluating Browning's defense.

50. State's Exhibit 1 for *in camera* review 4/25/02.

51. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

52. 12 O.S.2001, § 2503; *Robinson v. Lane*, 1971 OK 9, 480 P.2d 620, 622.

53. 12 O.S.2001, § 2511.

54. 1997 OK CR 64, 947 P.2d 1090, 1108, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998).

privilege regarding his doctor's testimony.[55] We have held a waiver of the privilege cannot be revoked after the privileged material has already been disclosed by personal interview with investigators.[56] There is no comparable disclosure to authorities here. Garrett did not exercise the privilege and could not waive it. She inadvertently gave the documents to the prosecutor, who had not asked for them and did not look at them until Browning asked generally for any mental health records. Garrett immediately asked for the records' return, noting that Cenessa had not authorized their release. While Cenessa may or may not have voluntarily disclosed other medical records, the record shows she explicitly refused to waive her privilege as to the Indiana records. The trial court did not err in finding that there was no waiver of the privilege and Browning was not entitled to the records.

¶ 31 This Court has reviewed the sealed material to determine whether it contained evidence favorable to Browning. We determine that the documents contain nothing material either to guilt or punishment.[57] There is no reasonable probability that, had this evidence been disclosed, the result of the trial would have been different.[58] As there was no waiver, and the sealed material contains nothing favorable to the defendant, this proposition is denied.

¶ 32 In Proposition VII Browning claims that the trial court erred in admitting photographs of Cenessa and the deceased victims. Browning argues that the trial court erred in admitting (a) several photographs of Teresa Hye's charred body, taken as she was unearthed in the rubble of the crime scene; (b) photographs of Harry after he was admitted to the hospital immediately after the crimes; and (c) photographs of Cenessa as she was treated at the hospital. Browning objected to admission of these photographs at trial and has preserved this error for appeal. The admission of photographs is within the trial court's discretion and will not be disturbed absent abuse of discretion.[59] Photographs may be used to show the nature and location of wounds, corroborate the medical examiner's testimony, or show the crime scene.[60] The photographs of Harry at the hospital showed the nature and extent of his wounds and corroborated testimony of both Harry's treating physician and the medical examiner. The photographs of Cenessa showed the nature and extent of her injuries, duct tape on her hands and hair, and soot on her face and hands. They corroborated the testimony of Cenessa's treating physician and emergency medical personnel as well as her own account of the crime. All these photographs were relevant, and not so gruesome that the jury could not view them impartially.[61] Because each photograph showed a different aspect of the victims' wounds, they were not cumulative in nature.[62]

55. Id. In In Re Porter's Estate, 1953 OK 155, 257 P.2d 517, heirs contesting a will waived any privilege when they offered documents into evidence. In Buffington v. Gillette Co., 101 F.R.D. 400 (W.D.Ok.1980), plaintiffs waived the privilege when they provided defendant directly with hospital records as a part of discovery.

56. Driskell v. State, 1983 OK CR 22, 659 P.2d 343 (defendant waived privilege and gave his doctors permission to talk to authorities, then tried to revoke waiver after they did so).

57. Kyles v. Whitley, 514 U.S. 419, 432–33, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); Brady v. Maryland, 373 U.S. 83, 86, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

58. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); Knighton v. State, 1996 OK CR 2, 912 P.2d 878, 891,

cert. denied, 519 U.S. 841, 117 S.Ct. 120, 136 L.Ed.2d 71.

59. Malicoat v. State, 2000 OK CR 1, 992 P.2d 383, 405, cert. denied, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146; Alverson, 983 P.2d at 512; Smith v. State, 1996 OK CR 50, 932 P.2d 521, 531, cert. denied, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997).

60. Malicoat, 992 P.2d at 405; Livingston v. State, 1995 OK CR 68, 907 P.2d 1088, 1094.

61. Livingston, 907 P.2d at 1094; McCormick v. State, 1993 OK CR 6, 845 P.2d 896, 898–99.

62. Alverson, 983 P.2d at 512; Neill v. State, 1994 OK CR 69, 896 P.2d 537, 552, cert. denied, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); President v. State, 1979 OK CR 114, 602 P.2d 222, 225.

¶ 33 Browning claims the photographs of Teresa were irrelevant because testimony tended to show she died of her gunshot wounds, not the fire. He claims this Court has held that it is error to admit gruesome photographs showing a victim's burnt body where the victim died of other causes. This is not the case. In *Livingston v. State* we held that it was error to admit the egregious, perturbing autopsy photographs of the severely burnt victim where they had no relevance to the case; neither the medical examiner nor anybody else relied on them, the fire was not the cause of death, and they did not depict the scene of the crime.[63] Given Browning's vigorous attempts to attack Cenessa's credibility, the photographs of Teresa were relevant to corroborate Cenessa's testimony as well as that of emergency responders. The photographs were taken as Teresa's body was uncovered at the scene of the crime. They show the crime scene and corroborate Cenessa's description of where Teresa was shot, as well as her account of the duct tape around Teresa's head, wrists and ankles. While extremely unpleasant, these photographs do not provoke the visceral, unreasoned emotional response this Court described in *Livingston*. They were not so repulsive that the jury could not view them impartially. The trial court did not abuse its discretion in admitting these photographs. This proposition is denied.

¶ 34 In Proposition VIII Browning correctly claims that his convictions for First Degree Arson (Count IV) and Robbery with a Firearm (Count V) must be reversed with instructions to dismiss. Browning was charged with the murders of Teresa and Harry Hye as (a) malice murder; (b) felony murder with arson in the first degree as the underlying felony; and (c) felony murder with robbery with firearms as the underlying felony. The jury could have found any of these alternatives. Evidence supports a finding of malice murder as to both victims; Teresa died of gunshot wounds, probably (but not conclusively) before receiving any burns; Harry died of a combination of his burns and gunshot wound. The jury returned a general verdict of murder. Under these circumstances, case law overwhelmingly dictates that the Court will treat the convictions as ones for felony murder, and dismiss the underlying felonies.[64] We do so here.[65] This proposition is granted, and Counts IV and V are dismissed.

63. 907 P.2d at 1094.

64. *Alverson*, 983 P.2d at 521 (reaffirming *Munson* and holding that where separate verdict forms show jury finds both malice and felony murder, verdict will be interpreted as malice murder and underlying felonies may stand); *Brown v. State*, 1998 OK CR 77, 989 P.2d 913. 930; *Wilson v. State*, 1998 OK CR 73, 983 P.2d 448, 463, *cert. denied*, 528 U.S. 904, 120 S.Ct. 244, 145 L.Ed.2d 205 (1999); *Williams v. State*, 1991 OK CR 28, 807 P.2d 271, 273–74; *Tibbs v. State*, 1991 OK CR 115, 819 P.2d 1372, 1376 n. 5; *Munson v. State*, 1988 OK CR 124, 758 P.2d 324, 332, *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

65. The State acknowledges settled law, but imaginatively argues that the record contains evidence of the jury's actual findings of malice murder, so the felony convictions may stand. This has absolutely no basis in the record. The original record contains a copy of the jury instructions. This copy bears the handwritten notation "all agree" beside the elements of first degree malice murder, shooting with intent to kill, arson, robbery with firearms, and beside listing for the aggravating circumstance of great risk of death in the instruction giving the charged aggravating circumstances. The notation "All A" or "All 4" is written on the instruction requiring that aggravating circumstances must outweigh mitigating evidence, and noting that even then jurors may impose a sentence other than death; several phrases in this instruction are also underlined or circled. In addition, phrases in second stage instructions 5, 7, 8, 9 and 11 appear to be highlighted. No written notations are found on any other pages of the instructions found in the original record. The State argues this must mean that jurors found Browning guilty of malice murder, but not of felony murder. Nothing in the record supports this leap of faith. First, this Court has no way of knowing who made those notations, or at what time. The record does not even indicate that this copy of the instructions was in the jury room during deliberations. To suggest that they must have been made by a juror, and that the juror was recording the consensus, is pure speculation. Also, if the State is right, jurors found the evidence supported the aggravating circumstance of great risk of death, but not heinous atrocious, or cruel. This interpretation is inconsistent with the verdict forms, which clearly indicate that jurors found both these aggravating circumstances.

## Prosecutorial Misconduct

¶ 35 In Proposition IX Browning claims that the State engaged in improper argument in first and second stages. He admits that counsel for both sides may discuss reasonable inferences from the evidence, and we will find error only if a grossly unwarranted argument affects the defendant's rights.[66] Browning's objections to some comments were sustained, curing any error.[67] Taken as a whole, the remaining comments neither deprived Browning of a substantial right nor went to the foundation of his defense.[68] This proposition should be denied.

▇▇▇▇ ¶ 36 As part of his claims, Browning objects to the prosecution's use throughout closing argument of a Power-Point slide presentation showing selected photographs and talking points. The presentation included photos of the burning home, Harry at the hospital, and Teresa's remains at the scene. We have already determined that the photographs used in this presentation were properly admitted (see Proposition VII). Exhibits properly admitted at trial may be used in closing argument.[69] The parties' wide latitude in argument includes latitude to use visual aids.[70] We have upheld the prosecution's use of large projections of color slides and photographs throughout the trial, as the display of otherwise admissible photographs is within the trial court's discretion.[71]

▇▇▇▇ ¶ 37 Browning complains that the prosecutor solicited sympathy for the victims when he began by painting a step-by-step word picture of the crime, asking jurors to imagine themselves as the victims as each event occurred. Browning failed to object, waiving all but plain error. This Court has upheld similar arguments which describe a victim's experience.[72] While we caution the prosecutor against encouraging jurors to become the victims, this argument was based on the evidence presented at trial. As it neither manipulates nor misstates the evidence, there is no plain error.[73] The trial court sustained Browning's objection and admonished the jury when the prosecutor told jurors he hoped they would remember the victims as they lived on the day before their death, not by the pictures introduced at trial or the testimony of their last minutes on the day of the crime. This cured any error.

▇▇▇▇ ¶ 38 Browning argues the State improperly engaged in childish name-calling when the prosecutor called him a monster, a cold-blooded killer, and a wolf in sheep's clothing. His objections to the two former terms were overruled, and he failed to object to the other comment. We have looked on name-calling with disfavor as an unwarranted expression of personal opinion.[74] However, the last two comments were reasonable inferences from the evidence.[75] The trial court did not abuse its discretion in denying Browning's objection to "cold-blooded killer", and there was no plain error in calling Browning a wolf in sheep's clothing. While we cannot condone the unprovoked use of the

66. *Banks,* 43 P.3d at 401; *Hooks,* 19 P.3d at 314.

67. *Dodd v. State,* 2004 OK CR 31, 100 P.3d 1017, 1044, *cert. denied,* —— U.S. ——, 126 S.Ct. 62, 163 L.Ed.2d 89 (2005).

68. 20 O.S.2001, § 3001.1.

69. *Alverson,* 983 P.2d. at 513.

70. *Miller v. State,* 1998 OK CR 59, 977 P.2d 1099, 1110, *cert. denied,* 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999).

71. *Conover v. State,* 1997 OK CR 6, 933 P.2d 904, 914.

72. *Malicoat,* 992 P.2d at 401; *Hooper,* 947 P.2d at 1110.

73. *Malicoat,* 992 P.2d at 401; *Wilson v. State,* 1998 OK CR 73, 983 P.2d 448, 470, *cert. denied,* 528 U.S. 904, 120 S.Ct. 244, 145 L.Ed.2d 205 (1999); *Darden v. Wainwright,* 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986). In *Wilson,* we cautioned a prosecutor who began his second stage closing argument by asking the jurors to put themselves in the victim's place. However, that alone was not our basis for declaring that the prosecutor's comments taken as a whole were clearly error. *Wilson,* 983 P.2d at 470–71.

74. *Malicoat,* 992 P.2d at 401; *Le v. State,* 1997 OK CR 55, 947 P.2d 535, 555, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).

75. *Hanson,* 72 P.3d at 50.

term "monster", the single use of the word did not affect the verdict.

¶ 39 Browning says the State undercut his right to a defense and to counsel. During the first stage closing, prosecutors referred to Browning's theory of defense as ridiculous, absolutely preposterous, and half-baked. Later, the State said Browning was desperate and would blame anyone to get out of trouble. The prosecutor also argued Browning blamed the crime on everyone who took the stand. Browning did not object to these comments and has waived all but plain error. There is none. These are all reasonable inferences from the evidence.[76] Later, the prosecutor noted the defense attorney challenged all the State's witnesses, never said "No questions" and even argued with the doctor over whether Harry was burned in a house fire. The trial court sustained Browning's objection, curing any error.

¶ 40 The trial court overruled Browning's objection to the argument that he was just throwing out as many theories as possible, and, although Browning did not have to explain anything, he offered no rational explanation. However, the court sustained Browning's objection and admonished the jury when the State continued that the defense just said they were confused but offered no evidence whatsoever. The State continued this line of argument without objection and accused the defense of throwing people and issues out to confuse the jury and avoid talking about the relevant evidence in the case. Most of this is reasonable inference from the evidence. The only dubious comment in this argument was that which suggested that Browning should have presented some rational explanation for the crime. However, the prosecutor was careful to tell jurors that Browning didn't have to present anything. For this reason, the trial court did not abuse its discretion in overruling Browning's objection.

¶ 41 Browning claims the prosecutor unfairly attacked defense counsel by arguing that he was frustrated he could not impeach Cenessa's testimony and ended her cross-examination by "a bunch of screaming

from Perry Mason, well, you're lying about everything, aren't you?" Browning's objection to this argument was overruled. In context, this was not a personal attack on counsel. Although the cold record before the Court does not contain indications of pace or volume, this certainly appears to be a reasonable observation of counsel's actions. In second stage the prosecutor did personally attack defense counsel by telling jurors he objected to counsel looking jurors in the eye as though they were personally killing Browning. Browning's objection was sustained and the jury admonished, curing any error.

¶ 42 Browning did not testify, but his defense clearly was that he did not commit the crimes. The prosecutor argued Browning claimed he might not have been there, but jurors never really heard the defense discuss Cenessa's accurate description of his clothing that night, leaving the impression that he was not there without talking about the evidence. The prosecutor ended his final first stage closing by telling jurors to look at Browning, and asked what kind of man would commit these crimes, do nothing to save the mother of his child or his baby, remain emotionless and take no responsibility. Browning's objection to the "mother and baby" argument was overruled. Browning complains that both these arguments were impermissible comments on his right to testify. While a prosecutor may not comment on a defendant's choice not to take the stand, neither of these remarks do so. The first is a reasonable inference from the evidence. The second may be an attempt to appeal to the jury's emotions on the basis of the facts, but, in this context, it has nothing to do with Browning's choice not to testify.

¶ 43 Both parties spent a great deal of time in argument discussing Cenessa's testimony. Defense counsel suggested that she had participated in this crime and was blaming Browning because she was angry at him. He vigorously questioned her account of events and her actions. In response, the State called her a courageous hero based on her attempts to rescue her parents. The

**76.** *Malicoat,* 992 P.2d at 402.

State asked jurors to contrast her human acts and words with Browning's inhuman actions. The prosecutor noted that Cenessa stood up to hours of direct and cross-examination, told a consistent story, and admitted when she had lied to investigators. He noted that if Browning's theory was true, Cenessa deserved an Oscar for her performance on the stand. This is not, as Browning claims, vouching for Cenessa's veracity. "Vouching occurs when a prosecutor expresses a personal belief in a witness's credibility, either through explicit assurances or by implying that other evidence, not presented to the jury, supports the witness's testimony." [77] This line of argument used reasonable inferences from the evidence to respond to defense counsel's closing argument about Cenessa.

▮ ¶ 44 Browning claims that, in second stage, the prosecutor improperly argued that he showed no remorse for the crimes. Actually, the prosecutor did not mention remorse. He urged jurors to have sympathy for Browning's family based on their emotion-laden testimony, but asked them not to shed a tear for Browning, who never shed a tear for the victims. This is supported in part by the evidence; Cenessa did not testify that Browning cried when she was able to observe him during the crimes. Browning did not object, and there is no plain error.

▮ ¶ 45 The prosecutor began the second stage first closing by stating, without objection, that this case was so heinous it cried out for the death penalty. This statement was repeated throughout both closing arguments. Prosecutors noted without objection that jurors were writing the final chapter of this story, bringing a case to justice, and giving a sense of justice to the family. In first and second stage closing arguments the prosecutors suggested, without objection, that the theme of the case was "one or two centimeters from justice." This

referred to the length between Cenessa's neck wound and her carotid artery—that is, between her life and her death. Although this Court discourages expressions of personal opinion, we have held that appeals in argument to justice are not error when they appeal to the jury's understanding of justice under the facts of the crime.[78] Although some of these references to justice border on improper, they do not constitute plain error.

▮ ¶ 46 During second stage closing argument, defense counsel begged for his client's life and "respectfully and humbly" asked jurors not to kill Browning. In final closing, the prosecutor stated he was disturbed by counsel's use of the word "kill". He argued that everyone in the courtroom knew the end result of the proceedings, if the jury found the State had proved its case, would be that Browning was put to death. Without objection, he went on, "But you, ladies and gentlemen of the jury, are not killers." He stated jurors were upholding the law as they had sworn to do, and had to base their decision on the evidence presented by the State. Contrary to Browning's claim, in context this argument does not impermissibly diminish the jury's responsibility to impose a sentence of death.[79] This does not rise to the level of plain error.

### Issues Relating to the Second Stage of Trial

▮ ¶ 47 In Proposition X Browning argues there was insufficient evidence to support the jury's finding that the murders of Teresa and Harry Hye were especially heinous, atrocious, or cruel. We will review the sufficiency of the evidence in the light most favorable to the State to determine if any rational trier of fact could have found this aggravating circumstance beyond a reasonable doubt.[80] The heinous, atrocious or cruel aggravating circumstance requires proof be-

77. *Hanson*, 72 P.3d at 50, n. 28.

78. *Harris*, 84 P.3d at 753; *Lockett v. State*, 2002 OK CR 30, 53 P.3d 418, 425, *cert. denied*, 538 U.S. 982, 123 S.Ct. 1794, 155 L.Ed.2d 673 (2003)

79. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (constitutionally impermissible to mislead sentencing jury into believing responsibility for determining appropriateness of death sentence rests elsewhere).

80. *DeRosa v. State*, 2004 OK CR 19, 89 P.3d 1124, 1153, *cert. denied*, 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005); *Washington v. State*, 1999 OK CR 22, 989 P.2d 960, 974.

yond a reasonable doubt that the victim's murder was preceded by torture or serious physical abuse, including great physical anguish or extreme mental cruelty.[81] A finding of serious physical abuse requires proof that the victim consciously suffered before death.[82] After initially determining one of these factors is present, the Court may consider the defendant's attitude and the pitiless nature of the crime.[83]

¶ 48 Before Teresa and Harry died, they were bound and gagged at gunpoint by Browning, someone they knew and trusted, the father of their daughter's child. They watched as he took their valuables. Helpless, they were carried to their own closet, smelled lighter fluid, and watched as Browning set the closet on fire. All this time Teresa was crying and begging Browning not to do this, and Harry tried to loosen his bonds. Finally, Teresa watched as Pethel shot Harry. When she screamed Pethel told her, "Shut the fuck up" then shot her. Before they were shot, Teresa and Harry were aware that their pregnant daughter Cenessa was bound and gagged with them in the closet and could suffer the same fate. While Harry might have believed Cenessa would be trapped in a fire, Teresa could know she might be shot and killed as well.

■■ ¶ 49 Browning first claims there was insufficient evidence of this aggravating circumstance for Teresa since the medical evidence suggested she died of her gunshot wounds very shortly after being shot. Browning claims there was thus no evidence of the conscious suffering necessary for a finding of serious physical abuse. While there is little, if any, evidence to support

serious physical abuse, the facts certainly support a finding of extreme mental cruelty.[84] He claims that Teresa was not afraid and did not believe she or the family would be harmed or killed since Browning began by saying the family would not be hurt. This is not supported by the evidence showing Teresa was sobbing, screaming, and begging both defendants not to do this from the beginning of the ordeal. Browning also suggests that, since the victims were in the closet for only a brief time and shot quickly, any apprehension of death after the victims were placed in the closet was too short to constitute the significant time period required for torture.[85] However, the torture began almost an hour earlier when the victims were bound and gagged at gunpoint. Browning cannot credibly claim that Teresa's extreme mental distress was not caused by his actions, as he instigated and participated in the crimes, and evidence showed he intended to demoralize, frighten and then kill his victims.[86] Nor can Browning claim that the actions causing this mental torture were merely part and parcel of Teresa's murder itself, which was clearly carried out by gunshot.[87] The record amply supports the jury's determination that Teresa's death was preceded by mental torture, causing extreme mental distress, and thus heinous, atrocious or cruel.

■■■ ¶ 50 Browning next claims that Harry's death was not heinous, atrocious or cruel. In doing so, he argues without citation that the proof of conscious suffering required for serious physical abuse must be conclusive and definitive. This Court has not held that conscious suffering requires conclusive, definitive proof, and we decline to do so

81. *DeRosa*, 89 P.3d at 1155–56; *Davis v. State*, 2004 OK CR 36, 103 P.3d 70, 81; *Cheney v. State*, 1995 OK CR 72, 909 P.2d 74, 81 (and cases cited therein); *Stouffer v. State*, 1987 OK CR 166, 742 P.2d 562, 563, *cert. denied* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

82. *Crawford v. State*, 1992 OK CR 62, 840 P.2d 627, 640–41.

83. *Robinson v. State*, 1995 OK CR 25, 900 P.2d 389, 402; *Nuckols v. State*, 1991 OK CR 10, 805 P.2d 672, 675, *cert. denied*, 500 U.S. 960, 111 S.Ct. 2276, 114 L.Ed.2d 727.

84. For example, in *Hawkins v. State*, 1994 OK CR 83, 891 P.2d 586, 596–97, *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995), we found extreme mental cruelty where a victim was separated from her helpless children only to wonder about their safety for hours, permitted a brief visit, and then dragged away as she screamed "good-bye".

85. *Washington*, 989 P.2d at 975; *Cheney*, 909 P.2d at 81.

86. *Cheney*, 909 P.2d at 80.

87. *Id.*

here. In *Hawkins v. State*,[88] we described serous physical abuse as "gratuitous violence inflicted on the victim beyond the act of killing." Contrary to Browning's argument, that description was not intended as a definition or limit on the phrase. This Court has declined to adopt a definition of "serious physical abuse", including the one in *Hawkins*, or "conscious physical suffering."[89] However, evidence at trial amply supports a conclusion that Browning intentionally inflicted gratuitous violence beyond the act of killing on Harry. Browning emphasizes the extent of Harry's burns to suggest that Harry's wounds were too severe for conscious physical suffering. His claim is contradicted by the evidence at trial that Harry was conscious and in pain at the scene of the crime, and in pain at the hospital.[90] While some of Harry's third-degree burns would not have been painful, his first and second degree burns would have been (and, according to the testimony, were) extremely painful, as was the gunshot wound. Incredibly, Browning claims that any physical abuse Harry suffered was attendant to the violence necessary in the act of killing itself. By Browning's own account on appeal, Harry was intended to die from the gunshot wound. Instead, Harry was badly burned and lingered, in pain and occasionally conscious, for several weeks before succumbing to the combination of the burns and the shot. In addition to evidence of conscious suffering, of course, the testimony described above also supports a finding that Harry suffered extreme mental distress as a result of Browning's intentional infliction of mental cruelty amounting to torture.

¶ 51 Browning concludes that the jury must have used irrelevant evidence or been swayed by allegedly improper argument in finding that Teresa and Harry's murders were heinous, atrocious or cruel.[91] To reach this conclusion Browning first minimizes or disregards the evidence presented which supports this aggravating circumstance. He then argues that the jury instruction did not appropriately guide the jury's discretion in making the necessary factual findings for this aggravating circumstance. Browning did not object when his jury received the standard Oklahoma Uniform Jury Instruction on this aggravating circumstance which was in effect at the time of his trial.[92] While that instruction has been modified since Browning's trial, we have held that the version of the instruction given at Browning's trial will not provide a basis for reversal.[93] Browning argues that (a) there was no evidence from which the jury could have found either extreme mental cruelty or conscious physical suffering, and (b) the jury was unaware of those requirements and thus could not have made those findings, so (c) the aggravating circumstance cannot stand as to either victim. The record does not support this claim. We will not join Browning in speculating that jurors disregarded the ample evidence of mental torture as to each victim, and the significant evidence of Harry's conscious physical suffering. Any rational trier of fact could have found beyond a reasonable doubt that these murders were especially heinous, atrocious or cruel. This proposition is denied.

¶ 52 Browning argues in Proposition XI that the heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague and overbroad as it is applied in Oklahoma. This Court has consistently held that the heinous, atrocious or cruel aggravating circumstance is constitutional as currently applied to Oklahoma capital defendants.[94]

88. *Hawkins*, 891 P.2d at 596–97.

89. *DeRosa*, 89 P.3d at 1155.

90. Contrary to Browning's assertion on appeal, not only did Dr. Giddens testify that paramedic Stamps's notes from the scene indicated Harry was awake and talking, but Stamps himself testified that Harry was awake, moving around, and complaining of pain on his back.

91. Browning's claims regarding inflammatory closing argument are discussed in Proposition IX.

92. OUJI–CR (2nd) 4–73.

93. *DeRosa*, 89 P.3d at 1156. Browning's claims regarding the constitutionality of this aggravating circumstance, and the uniform instruction defining it, are addressed in Proposition XI.

94. *Thacker v. State*, 2004 OK CR 32, 100 P.3d 1052, 1058, *cert. denied*, 544 U.S. 911, 125 S.Ct.

Browning encourages us to reconsider this conclusion on two bases. Neither has merit.

¶ 53 Browning first suggests that our recent decision in *DeRosa v. State*,[95] in which we modified the standard uniform instruction on the heinous, atrocious or cruel aggravating circumstance, implies that the former instruction is inadequate. As the former instruction was given in Browning's case, he argues his jury was not instructed on the core elements of this aggravating circumstance and his case should be reversed. In *DeRosa*, to forestall any such claim, we specifically stated:

> This instruction does not change any of the legal requirements of the "heinous, atrocious, or cruel" aggravating circumstance as it has existed up until this time.... This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate, and this Court does not hold thus. Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis. Such cases will be evaluated in the same manner as they have been in the past.[96]

¶ 54 Browning also claims that recent developments in capital sentencing law compel reversal in cases in which jurors received the former instruction on this aggravating circumstance. He relies on *Blakely v. Washington*,[97] in which the United States Supreme Court invalidated Washington state's sentencing guidelines. Those guidelines provided that a sentencing judge could depart from the recommended sentencing range and impose a sentence greater than the maximum statutory range, upon finding certain enumerated aggravating factors. The Supreme Court followed its earlier decision in *Apprendi v. New Jersey*,[98] where it held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court in *Blakely* concluded that the defendant had a right to a jury determination of the facts supporting the imposition of a sentence greater than that authorized by state law upon the verdict alone.[99] In *Ring v. Arizona*,[100] the Court applied *Apprendi* to capital cases, holding that jurors must find beyond a reasonable doubt every fact necessary to support a sentence of death.

¶ 55 Browning argues these United States Supreme Court holdings require that Oklahoma juries must find mental cruelty or serious physical abuse involving conscious suffering, as appropriate, where the murder is alleged to be heinous, atrocious or cruel.[101] He misunderstands the nature of the factual finding necessary to authorize a sentence of death based on this aggravating circumstance. In Oklahoma, jurors may consider a capital sentence only after they unanimously find one aggravating circumstance

---

1611, 161 L.Ed.2d 288 (2005)(and cases cited therein). Browning emphasizes the Tenth Circuit's continuing scrutiny of our application of this aggravating circumstance. As we recently stated, this aggravating circumstance is not rendered unconstitutional "simply because a state appellate court applies it in a manner with which defendants, or even federal appellate courts, disagree." *DeRosa*, 89 P.3d at 1155.

**95.** 2004 OK CR 19, 89 P.3d 1124.

**96.** *DeRosa*, 89 P.3d at 1156 (citations omitted).

**97.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**98.** *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Apprendi* relied on *Jones v. United States*, 526 U.S. 227,

119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), which discussed historical sentencing practices and concluded that a federal criminal statute, providing three separate penalties based on differing factors, established three separate offenses with separate elements.

**99.** *Blakely*, 542 U.S. at 304, 124 S.Ct. at 2538.

**100.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**101.** Browning does not claim that juries must make a separate finding on a verdict form, checking off each factor as appropriate, in order to find the presence of this aggravating circumstance. He argues rather that juries must be specifically instructed on each factor as described in *DeRosa*, before a jury finding of an aggravating circumstance may stand.

beyond a reasonable doubt.[102] The fact necessary for a finding that a murder is heinous, atrocious or cruel is that the murder was preceded by either torture or serious physical abuse.[103]

¶ 56 Browning appears to have interpreted too expansively our comment in *DeRosa* regarding the modified jury instruction for this aggravating circumstance. After emphasizing that the modified instruction did not change the elements of the aggravating circumstance, which had been contained in the previous instruction, we noted, "Rather, it is intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." [104] As the modified instruction itself states, jurors must first find that the murder was preceded by torture or serious physical abuse, and that under the facts and circumstances of the case the murder was heinous, atrocious, or cruel.[105] The subsequent definitions and descriptions in the instruction are designed to assist jurors in making that initial factual determination. Extreme mental cruelty amounting to torture, or conscious physical suffering, must be present in each case alleging this aggravating circumstance. However, explicit findings of extreme mental cruelty or conscious physical suffering cannot be required in every case. This aggravating circumstance may be proved by two very different types of evidence—of mental torture or serious physical abuse—and must turn on the individual facts of each case. As long as the jury has the evidence necessary to make findings that torture or serious physical abuse was present in a particular case, jurors may unanimously make that finding of fact beyond a reasonable doubt. Oklahoma jurors currently are required to find beyond a reasonable doubt the facts

necessary to find this aggravating circumstance, and thus to support a sentence of death. This proposition is denied.

¶ 57 In Proposition XII Browning claims his rights to due process and trial by jury were violated when the trial court failed to instruct jurors that the death penalty could not be imposed unless the jury first found that aggravating circumstances outweighed mitigating evidence beyond a reasonable doubt. Browning admits this Court has consistently held there is no need to instruct jurors that aggravating circumstances must outweigh mitigating evidence beyond a reasonable doubt. He asks this Court to reconsider this position in light of *Apprendi, Ring,* and *Jones.* As we discuss above, these cases established the principle that a defendant is entitled to jury determination of each fact which would increase his punishment beyond the statutory maximum. This Court has recently considered this argument in light of these cases, and rejected it.[106] Constitutional requirements are satisfied by Oklahoma's requirement that, before considering a sentence of death, jurors must unanimously find an aggravating circumstance beyond a reasonable doubt. This proposition is denied.

¶ 58 Browning claims in Proposition XIII that the instructions on the issue of mitigation permitted jurors to ignore mitigating evidence altogether, and seriously diminished the effect of the mitigating evidence presented. The jury was instructed that mitigating evidence may extenuate or reduce a defendant's degree of moral culpability or blame, but the instructions did not specifically require jurors to consider mitigating evidence. Browning did not object to these instructions at trial and has waived all but plain error. There is none. This Court has consistently rejected this argument.[107]

102. *Torres v. State,* 2002 OK CR 35, 58 P.3d 214, 216, *cert. denied,* 538 U.S. 928, 123 S.Ct. 1580, 155 L.Ed.2d 323 (2003); 21 O.S.2001, §§ 701.10, 701.11.

103. *See, e.g., Davis,* 103 P.3d at 81; *Banks,* 43 P.3d at 400–01.

104. *DeRosa,* 89 P.3d at 1156.

105. *Id.*

106. *Harris v. State,* 2004 OK CR 1, 84 P.3d 731, 754–755; *Torres,* 58 P.3d at 216.

107. *See, e.g., Welch v. State,* 2000 OK CR 8, 2 P.3d 356, 374, *cert. denied,* 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567; *Alverson,* 983 P.2d at 518.

Browning gives us no reason to reconsider this position.[108] This proposition is denied.

¶ 59 In Proposition XIV Browning claims that the accumulation of error in his case requires relief. In Proposition VIII we found that Browning's convictions for arson and robbery with firearms should be reversed with instructions to dismiss. We found some error in argument in Proposition IX; however, standing alone, this error does not require relief. We found no other error. Consequently there is no accumulative error.[109] This proposition is denied.

### Mandatory Sentence Review

¶ 60 We must determine (1) whether the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's findings of aggravating circumstances.[110] Upon review of the record, we cannot say the sentences of death were imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor.

¶ 61 The jury was instructed on and found the existence of two aggravating circumstances: (1) the defendant knowingly created a great risk of death to more than one person, and (2) the murders were especially heinous, atrocious or cruel.[111] Browning presented evidence that he was even-tempered and not known for violence, was good with children and family, tended to be passive and a follower, and had poor reading skills. The jury was instructed on six mitigating factors.[112] Upon our review of the record, we find that the sentences of death are factually substantiated and appropriate.

¶ 62 Michael Allen Browning was convicted of First Degree Murder (Counts I and II), Shooting with Intent to Kill (Count III), First Degree Arson (Count IV), and Robbery with Firearms (Count V) in Case No. CF–01–1098, in the District Court of Tulsa County, sentenced to two sentences of death, life imprisonment, thirty-five (35) years imprisonment and a $25,000 fine, and appeals. The Judgments and Sentences of the District Court on Counts I, II, and III are **AFFIRMED**. The Judgments and Sentences of the District Court on Counts IV and V are **REVERSED** with instructions to **DISMISS**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

---

**108.** Browning cites *Rojem v. Gibson*, 245 F.3d 1130 (10th Cir.2001). In that case, the federal court granted relief where the trial court failed to give the instruction requiring jurors to weigh aggravating circumstances and mitigating evidence. The Tenth Circuit noted that, without this instruction, jurors were never instructed to consider mitigating evidence in any way. This is not analogous. Browning's jury was told to weigh the aggravating circumstances and mitigating evidence, was given a list of mitigating circumstances, and was instructed that jurors may decide other mitigating circumstances existed and that, if so, they should consider those circumstances.

**109.** *Alverson v. State*, 983 P.2d at 520.

**110.** 21 O.S.2001, § 701.13(C).

**111.** The jury was instructed on, but did not find, the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

**112.** These were: Browning had no significant history of prior criminal activity; he is likely to be rehabilitated; he cooperated with the authorities; his age; his character; his emotional and family history. Instruction No. 11.